799 A.2d 566 (2002)
351 N.J. Super. 577
Louis HORNBERGER, Robert Tonkery and James Mennuti, Plaintiffs-Appellants,
v.
AMERICAN BROADCASTING COMPANIES, INC., ABC Holding Company, Joan Martelli, Phyllis McGrady, John W. Zucker, John Quinones, Richard Wald, Jason D. Williamson, Raymond B. Campbell, Diane E. Armstrong, William Armstrong, Diane Sawyer, Robert Lange, Anna Sims Phillips, Craig Haft, Jeffrey Kleinman, Jack Norfloss, Richard White, and Mitchell Wagonberg, and Eric Wagonberg, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 2002.
Decided May 21, 2002.
*570 Neville L. Johnson (Johnson & Rishwain) of the California Bar, admitted pro hac vice, argued the cause for appellant (Lynch, Teitelbaum & Geldhauser, attorneys; Howard S. Teitelbaum, East Brunswick, and Mr. Johnson, of counsel and on the brief).
Kevin T. Baine (Williams & Connolly) of the Washington, D.C. bar, and Jack Borrus argued the cause for respondents (Borrus, Goldin, Foley, Vignuolo, Hyman, Stahl & Clarkin, attorneys; Mr. Baine, Mr. Borrus, Steven M. Farina, Washington, DC, (Williams & Connolly), Mary Rose Papandrea, New York, NY, (Williams & Connolly), and Eileen M. Foley, North Brunswick, on the brief).
Before Judges KING, CUFF and WECKER. *567 *568
*569 The opinion of the court was delivered by KING, P.J.A.D.
On June 28, 1996 at 9:30 p.m., plaintiffs, police officers in Jamesburg, stopped a Mercedes Benz in which defendants Raymond Campbell, William Armstrong and Jason Williamson, three young African-American *571 men, the "testers," were riding. Because Williamson, the driver, had changed lanes without signaling, plaintiffs demanded identification of the testers. When Campbell, the back-seat passenger, said that he did not have any identification, the officers ordered the three men out of the car, frisked them, searched the car's interior, found no contraband, and released them. Defendant Diane Armstrong, William Armstrong's mother, owned the Mercedes.
Defendants Joan Martelli and Anna Sims Phillips, producers of PrimeTime Live, a television program broadcast by defendant American Broadcasting Companies (ABC), had arranged for the testers to cruise in an expensive car to find out if the police would stop them. The incident was surreptitiously recorded with cameras concealed in the Mercedes and also in a van which followed the Mercedes. Defendants Richard Wald, an ABC vice president, and John Zucker, ABC's attorney, approved the use of the hidden cameras.
With the assistance of defendant Robert Lange, the senior producer, Martelli drafted a script for a PrimeTime Live broadcast entitled "DWB" (Driving While Black). Defendant Phyllis McGrady, executive producer, approved the script which was broadcast on national television in November 1996. Defendant John Quinones, an ABC correspondent, appeared on the program and defendant Diane Sawyer was a co-anchor.
Plaintiffs alleged that (1) the broadcast was defamatory and portrayed them in a false light; (2) a portion of the recording of a conversation between two of the plaintiffs while they were conducting the search violated the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -34; and (3) defendants fraudulently procured the tape of the episode.
Plaintiffs appeal from the dismissal by summary judgment, contending that the judge erred in ruling that (1) on the defamation claim, plaintiffs had neither consent nor probable cause to search the car, and the ABC defendants did not produce and publish the broadcast with actual malice; (2) on the electronic surveillance claim, plaintiffs had no expectation of privacy while they were searching the car; and (3) plaintiffs did not prove an actionable fraud claim. We agree with the judge's disposition and affirm.

I

The "DWB" BroadcastโNovember 27, 1996
We first summarize the factual record before the Law Division judge when he ruled on the motions for summary judgment. After a three-minute introduction, which included other topics on the PrimeTime Live program that night, the "DWB" segment ran for about twelve minutes. The broadcast began with Sawyer's account of recent rioting in Florida when police killed an African-American teenager during a routine traffic stop. Sawyer said that police target African-Americans when they are driving "simply because they're black," and three delegates at the Black Caucus convention in Washington, two of the testers in this case, and Professor Charles Ogletree of Harvard Law School concurred. The broadcast first showed a white officer in South Carolina who had stopped a black woman for speeding, pulled her out of her car, yelled at her to get down, and pushed her face to the ground. Then there was a scene of a funeral of a young black man who, according to Quinones, "was suffocated while being held down by police near Pittsburgh during a traffic stop. He'd been driving a Jaguar...."
*572 Quinones said that these were "extreme cases" and showed videotapes depicting more common examples: officers in Volusia County, Florida, stopping black motorists for minor traffic offenses; several times they asked for permission to search the cars, without any apparent cause.
Quinones then announced that "Prime-Time decided to try a little experiment" in "the all-American small town of Jamesburg, [central] New Jersey." (Described in Appendix A). He explained the hidden cameras, identified the testers, noted the time about 9:30 p.m., and said that the testers were "driving carefully through town on our second night in Jamesburg. This time, within minutes, they're pulled over." The broadcast showed the testers cruising in the Mercedes, and, after the car had stopped, Officer Hornberger approaching Williamson, the driver, and explaining that he had changed lanes without signaling. The broadcast did not identify the plaintiffs-officers by name. The narrative refers to them as "New Jersey Patrolmen."
The broadcast showed Hornberger asking the passengers for identification. The film showed that when Campbell, the rear-seat passenger, said that he did not have any, Hornberger asked him to "get out of the vehicle, please." While the film showed the officers searching the car, Quinones' narration stated that "they were stopped for a minor traffic violation" and "separated, questioned, even frisked.... And their car is searched, although police never asked permission."
Professor Ogletree intervened in the narration, stating that a traffic violation was "not a basis" to conduct the "complete search, going into packages," which was occurring. Quinones explained that Ogletree was maintaining that the officers were "conducting an illegal search."
The film showed Hornberger attempting to open a cosmetic case in the back seat of the car, remarking that it was locked, and Officer Tonkery saying, "probably dope." Ogletree commented: "Why would he say that? Hunch? Evidence? Because they're black men, probably, in a late-model car at night and that's all he needs. The rest he can fill in the blanks. It's sad."
Jamesburg Police Chief Knowles then said: "It's called profiling." In response to Quinones's questions, Chief Knowles explained that profiling was "a law enforcement term"; it "goes on every day, every night in every town, everywhere in the United States." Knowles said he did not "agree" with profiling and saw no reason to suspect "three young black men in a Mercedes." Nevertheless, he approved the search, which was "incidental to the individual officer's protection" and thus "constitutionally okay." When asked whether the officers should have requested permission to search, Knowles conceded, "it's a good point. I think it could be borderline."
Quinones questioned the reason for the initial stop, stating: "On another night we watched this same intersection for three hours.... We counted 260 cars at that intersection and of those, 223 also failed to turn on their blinkers, including four police squad cars.... And they weren't ... pulled over." Knowles said: "I don't have an answer.... [T]here's a possibility that this fit the criteria of profiling." Knowles admitted that Tonkery's assumption that the testers were carrying "dope" was "definitely inappropriate."
Quinones, continuing the narrative, observed that "where lawsuits have been filed," there was evidence that 62% of drivers stopped in Volusia County, Florida were black; 42% of drivers stopped in southern New Jersey were black; and 72% *573 of drivers stopped in northern Maryland were black. "Remember, only about 12 percent of the population is black."
Quinones suggested that stopping a few innocent people might be "a small price to pay ... to get drugs off the streets." Ogletree disagreed because "it's not going to get drugs off the street.... And it's not a small price to pay for my dignity and my respect and my self-esteem." Finally, Quinones related that the testers were released after twenty minutes, without a traffic violation summons. When Quinones inquired about an apology, Knowles said: "Police officers don't apologize for doing their job."
Sawyer closed the broadcast by saying that courts were "increasingly ... giving police the benefit of the doubt when it comes to traffic stops." She reported that the Volusia County, Florida case had been dismissed and an appeal by the drivers was pending. She stated that African Americans were developing "counter-strategies," such as driving "conservative cars" or placing a "baby seat in the back as a prop."
Martelli certified that she conducted substantial research on racial profiling before she produced "DWB." She read many articles and judicial opinions and interviewed law enforcement officials, attorneys and victims. The material she read included State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div.1996), in which the court relied on statistics of a disproportionate number of traffic stops of African-Americans on a southern section of the New Jersey Turnpike. Martelli and the others responsible for the production "felt that this was an important social issue" which met ABC's criteria for using concealed cameras. Phillips had contacted the three testers; she knew their families socially, and Diane Armstrong was her cousin. The testers had been cruising around for about twenty hours on four other evenings in various towns in central New Jersey before they were stopped in Jamesburg.

The Reason for the Stop
According to Hornberger, the stop occurred on June 28, 1996 at the intersection of County Route 522 and Forsgate Drive. Both the police car and the testers' vehicle were on Route 522 and had stopped at the traffic light at Forsgate Drive. At that intersection, traveling in that direction, the right lane was for turning right and the left lane was for going straight. Soon after, at a second traffic light, the right lane was for going straight and the left lane was for turning left. In order to continue straight ahead, a vehicle had to move quickly from the left lane to the right lane after the first traffic light.
Tonkery explained that the Mercedes went straight while traveling in the left-turn-only lane at the second light, "drove over a double-yellow line and a painted median," and "proceeded in front of me," causing Tonkery to brake hard in order to avoid an accident. According to Tonkery, the driver failed to use a signal for the lane change, failed to keep right, and disregarded a marked lane.
Tonkery admitted that investigation for possible wrongdoing was "one element of the stop," and he was "looking for a reason to stop the car." He explained that he had seen the same car with the same occupants two days before and knew that another officer thought that the car was "suspicious." The other officer, Sergeant Paul Karkoska, told Hornberger that the Mercedes had been seen driving around an area known for drug sales, and to "keep an eye on it."
Karkoska confirmed that, while on an investigation in an unmarked, stationary vehicle, he had seen the Mercedes in a *574 residential area known for drugs. After seeing the Mercedes pass him several times, he became suspicious because he was not familiar with it.

The Stop, Removal from the Car, and Frisks
Hornberger first said that when the officers initially stopped the Mercedes, and before talking to the driver, to insure his safety or "acquire a safe passage to speak to the operator of the vehicle," as he put it, he asked the rear-seat passenger, Campbell, to place his hands in plain sight. Campbell did not comply; he asked, "Is that necessary?" in an allegedly arrogant manner. Hornberger repeated his request and Campbell again refused to show his hands. After a third request, Campbell grunted in disgust and showed Hornberger his hands. Hornberger described Campbell as looking mean and angry. After reviewing the tapes Hornberger concluded that this exchange with Campbell occurred after he had asked the testers for their identification and after Armstrong, the front seat passenger, left the car.
Hornberger claimed that the tape revealed this incident, but his voice was "faint." Hornberger admitted that, apparently when viewing the tape from the sunroof camera, he could not hear his request that Campbell show his hands. However, Hornberger could hear Campbell say, "It's not necessary."
This exchange did not show up at any time on the film recorded by the rear view mirror or sunroof cameras. The film showed Hornberger approach the driver, Williamson, who asked if there was a problem; Hornberger responded, as he recalled in his deposition, that Williamson "failed to signal a lane change." Hornberger then asked Williamson for his license, registration and insurance card; Williamson produced them, and Hornberger pointed out that the insurance card had expired thirteen days earlier. Williamson looked for a valid insurance card. He could not find one. Hornberger testified he did not consider the insurance card "a major problem."
After this exchange, Tonkery asked Hornberger to get identification from the occupants of the Mercedes, which Hornberger did. This was the first time Hornberger addressed Campbell. Armstrong produced his identification, but, after a second request, Campbell, in the back seat, touched his pocket and responded: "I left mine at home."
Hornberger then ordered Armstrong out of the car; Hornberger explained that he did so because Campbell did not produce identification and he wanted to ask Armstrong for Campbell's name. Armstrong recalled being "patted down." Hornberger explained that a frisk or a "quick patdown" was standard police procedure when a person is asked to leave a car, because of the officer's safety concern.
Campbell and Williamson remained in the car while the officers were frisking Armstrong. Campbell, watching them from the rear window of the car, twice said to Williamson, "that's not necessary." Williamson also observed that one of the officers had produced a club. No officer was present during this conversation between Campbell and Williamson; Hornberger admitted he was "a little ways back" behind the car when Campbell said this. Clearly, Campbell was not responding to Hornberger, who also admitted that Campbell's left arm was on the window, in plain view, at this time. Hornberger conceded in testimony it was possible that Campbell did not hear his request to place his hands in view, or that he did not make that request three times. We could not hear the request on the tapes.
*575 After a short time, Officer Mennuti, also a plaintiff, ordered Campbell out of the car. Campbell recalled responding "[t]his ain't necessary." Campbell admitted that he was "[s]howing off for the camera." Mennuti recalled that when Campbell left the car he said: "I don't like cops." Campbell denied making this statement but Williamson did hear Campbell say that all cops were racists. The tapes did not record either of these statements. Mennuti explained that Campbell's "demeanor" justified asking him to get out of the car. Campbell denied that he was obnoxious or surly, or that he was trying to antagonize the officers.
Mennuti asked, "What are you guys doing down here?" The answer was inaudible but Mennuti recalled that Campbell answered, "just cruising." Hornberger then returned to Williamson, who remained in the driver's seat, and asked him the name of the rear seat passenger (Raymond). Williamson answered "Raymond," and Hornberger said that Armstrong said that it was "John." Armstrong admitted that he made a mistake about Campbell's name. The two had only recently met. Soon after this, Hornberger ordered Williamson out of the car and frisked him.

The Search of the Car
The videotapes show Hornberger first, and Tonkery joining him later, thoroughly searching the car. The search was extensive, into every crevice and area of the passenger compartment. One of the officers asked "What's in the bag, forties," referring to beer and indicating a paper bag in the back seat. The answer is inaudible, but one of the testers, apparently Campbell, said, "find out." Campbell apparently also said that it was water, but this was not audible either. The officer responded, "water. All you had to do is answer me." The officers later looked into the bag, which contained a water bottle.
Tonkery explained it was unnecessary to issue a summons because this was "an informative stop" for the driver. Chief Knowles explained that the county had recently modified the intersection where the testers were stopped and the police were issuing warnings but not summonses. No tickets issued for careless driving, unsignaled lane change, or the absence of an insurance card. 
The Views of Ogletree and Knowles
Martelli arranged for Quinones to interview, on camera, Harvard Law School Professor Ogletree on September 4, 1996 and Chief Knowles on September 20, 1996, after showing them an edited version of the films of the stop and search which she had prepared. Martelli believed that the excerpts she prepared "showed the most significant events." Martelli stated that she edited the tape, in part, because of its length and her program's time demands. Much of the original tape contained periods when nothing occurred or "dead space," as Quinones put it. Ogletree and Knowles both realized that the tape had been edited.
In his deposition, after he saw "the entire tape of the stop" Ogletree maintained his initial position that the search was illegal and appeared to be racial profiling. He did not think that the editing of the tape misled or deceived him. He commented upon the absence of any evidence of consent to search the car. Ogletree did not think the answer, "check it out," to the officer's question whether the paper bag contained "forties," was permission to search the car or even the bag.
Nor did Ogletree "consider the circumstances to be such ... that the officers were endangered." Ogletree concluded that the officers had no right to search the vehicle even when confronted with: (1) a *576 tip from another officer that the same car was "driving around" and "suspicious"; (2) no valid insurance card; (3) Campbell's lie that he had no identification and confusion about his name; and (4) Campbell's acting "in a totally surly manner to the police officers." Ogletree commented that "all of us look surly when we're stopped by the police."
When another factor was added, that the testers had no destination, Ogletree responded: "[T]hat is the most innocent of statements possible in America." Ogletree said that he cruised around with no destination when he was a student, and his children cruise around on Friday and Saturday nights. When confronted with Campbell's statements that "all cops are racists" and "I don't like cops," Ogletree conceded that, at that point, "the officers could reasonably have concern for their safety."

II
This is the procedural context in which the case comes to us. Plaintiffs, the police officers, filed a Law Division complaint in March 1998 and an amended complaint in August 1999. They alleged that PrimeTime Live was a "tabloid television show" which "pander[ed] to voyeuristic desires and other base emotions," demeaned and degraded others, invaded their privacy, and was a notorious user of "[h]idden cameras, ambush interviews, trespass, spying, false impersonation, and stalking." Plaintiffs accused defendants of interfering with police business while "manufacturing" a story and a controversy about racial profiling.
Count One of the amended complaint alleged that the November 1996 broadcast of PrimeTime Live "DWB" falsely stated the car was searched illegally and without consent. It contained incorrect statements by Professor Ogletree that the search was illegal and racially motivated because the version of the film shown to Ogletree had material facts deleted. Martelli had shown Ogletree and Chief Knowles only an edited version of the film of the incident, recorded their opinions, and used excerpts of these recordings in the broadcast. The program allegedly contained an inaccurate statement of Knowles, "it's called profiling," taken "out of context to attribute it to the actions of plaintiffs."
Plaintiffs complained that the broadcast compared them to "errant police officers beating up others and generally running amuck [amok]." They said that the broadcast falsely "accuses and implies that [plaintiffs] are racists and profilers."
The amended complaint alleged that the ABC executive defendants (all of the ABC defendants except Haft, Kleinman, Norfloss, White and the Wagonbergs, who were ABC's camera technicians) prepared the broadcast with knowledge of or reckless disregard of its falsity. They "set up" the story with hidden cameras, which "per se accuse a person of wrongdoing," and they did not afford plaintiffs an opportunity to respond. Plaintiffs asserted that the ABC executive defendants maliciously injured their reputations, damaged their employment prospects, and subjected them to nationwide humiliation and ridicule, resulting in emotional distress. In Count Two of the amended complaint, plaintiffs accused the testers and the ABC executive defendants of placing them in a false light. Count Three of the amended complaint alleged that the defendants violated the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -34, by intercepting plaintiffs' oral communications during the search of the interior of the vehicle.
Count Four of the amended complaint accused the testers and the ABC executive *577 defendants of fraud by failing to disclose the purpose of the stop and the hidden cameras. Plaintiffs also claimed Campbell, the rear-seat passenger, of fraudulently stating that he did not have identification. Plaintiffs demanded damages, costs, an apology, an opportunity to respond on ABC, destruction of the tapes, and forfeiture of defendants' surveillance devices.
All defendants moved for summary judgment. Plaintiffs opposed both motions and cross-moved for summary judgment on their electronic surveillance claim. Judge Garruto heard oral argument on August 4 and issued a written opinion on August 25, 2000. He granted summary judgment to all defendants on all of plaintiffs' claims. As noted, plaintiffs claim that the judge: (1) improperly dismissed the defamation and false light claims, (2) erred in dismissing the electronic surveillance claim, and (3) erred in dismissing the fraud claim.

III
Plaintiffs contend that the judge erred in dismissing their defamation and false light claims because there were genuine issues of material fact. Plaintiffs assert that, contrary to the judge's findings, the statement in the broadcast that there was no consent to search the car was untrue. Plaintiffs contend that this statement in the broadcast, together with (1) Ogletree's opinion that the search was invalid, which was based on incorrect facts, (2) the omission of exculpatory factors, and (3) the implication that the stop and search represented racial profiling and plaintiffs were racists, constituted defamation and cast them in a false light. Plaintiffs assert that they produced substantial evidence of defendants' actual maliceโthat defendants' knew that their representations were false or they recklessly disregarded their falsehood.
The judge found that plaintiffs did not obtain consent to search the vehicle. The judge found, despite Tonkery's claim that he obtained consent, that "Hornberger already [had] initiated the search" without asking for permission. The judge determined that the initial stop was warranted but the subsequent search of the testers and the Mercedes was "sorely lacking of justification" and without probable cause. The judge found no evidence to support plaintiffs' allegations they reasonably feared for their safety.
Regarding Ogletree's opinion that the search was improper, the judge recognized plaintiffs' argument that the "heavily edited videotapes" of the stop shown to Ogletree gave defendants "ample reason to doubt the accuracy of Ogletree's analysis." The judge did not discuss this argument further but commented there was no evidence that the tapes "were altered in any manner." Plaintiffs also contend that the judge erred in finding no evidence that the tape was edited. However, the judge did not find that the tape was unedited. He found no evidence that the tape was altered.
Summary judgment is appropriate if
there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.
[R. 4:46-2(c).]
In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. *578 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)), the Court explained:
The "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." ... If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact.... The import of our holding is that when the evidence "is so one-sided that one party must prevail as a matter of law," the trial court should not hesitate to grant summary judgment.
Defamation is a statement that is "false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community." Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164, 735 A.2d 1129 (1999). Because police officers are public officials, Costello v. Ocean Cty. Observer, 136 N.J. 594, 613, 643 A.2d 1012 (1994), plaintiffs must prove that the objectionable, false statements, which related to their official conduct, were published with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686, 706 (1964). This standard protects the freedom of expression on public questions guaranteed by the First Amendment. Actual malice is knowledge that the statement was false or reckless disregard for its truth. Ibid.; Lynch, 161 N.J. at 165, 735 A.2d 1129. Summary judgment is favored in defamation cases to encourage comment on matters of public concern. Lynch, 161 N.J. at 169, 735 A.2d 1129. Plaintiffs' burden of proof for each of the elements of defamation is by clear and convincing evidence. Rocci v. Ecole Secondaire, 165 N.J. 149, 159, 755 A.2d 583 (2000); Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 165, 735 A.2d 1129 (1999); Newman v. Delahunty, 293 N.J.Super. 491, 498-99, 681 A.2d 671 (Law Div.1994), aff'd o.b., 293 N.J.Super. 469, 681 A.2d 659 (App.Div.1996).
Plaintiffs also claim that the broadcast invaded their privacy by placing them in a false light. A false-light tort consists of publication of a falsity which significantly misrepresents the plaintiff's "character, history, activities or beliefs." Romaine v. Kallinger, 109 N.J. 282, 295, 537 A.2d 284 (1988). The publication must be "highly offensive to a reasonable person" and must be made with knowledge or reckless disregard of its falsity. Kallinger, 109 N.J. at 294, 537 A.2d 284 (quoting Restatement (Second) of Torts ง 652E (1976)). As plaintiffs concede and the judge found, the actual malice standard applies to the false light claim to avoid violation of the First Amendment's protection of freedom of expression. Hustler Magazine v. Falwell, 485 U.S. 46, 56, 108 S.Ct. 876, 883, 99 L.Ed.2d 41, 53 (1988).
We conclude the judge was correct. Plaintiffs failed to create a fact issue regarding the truth of the statement that the search was without consent. Whether the search was constitutionally reasonable is essentially a legal question, not, as plaintiffs assert, a statement of fact. Nevertheless, we think it appropriate to treat this issue as a fact question for the purpose of this defamation claim. As we discuss below, we agree with the judge that the search of the car was improper and Ogletree's opinion that it was illegal was correct. Because the statements in the broadcast that the search was without consent and illegal were true, we do not find it necessary to consider the issue of defendants' actual malice. We also find that other facts and circumstances which plaintiffs claim were improperly excised from the broadcast were not legally significant, as plaintiffs contend.

*579 A. Consent to Search the Car

We conclude the evidence that there was no consent to search was "so one-sided" that defendants "must prevail as a matter of law"; a "fair-minded jury" could not reasonably find that there was consent to search the car on the basis of the evidence, especially in view of plaintiffs' burden of proof by clear and convincing evidence. Liberty Lobby, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.
All three testers denied that plaintiffs asked for permission to search. Hornberger admitted that he did not ask the driver for consent to search the car and the driver did not give him consent. Tonkery claimed that he asked Williamson whether there was any contraband in the vehicle; when Williamson responded "no," Tonkery asked, "you wouldn't mind if I looked, then, would you? And I believe he said no." This exchange is not on the tapes. Tonkery admitted that Hornberger initiated the search and could not recall whether his conversation about contraband with Williamson preceded the search.
Hornberger, who initiated the search, admitted that he did not have consent. Tonkery "believed" that Williamson gave him consent to search but was uncertain that this conversation occurred before Tonkery commenced his participation in the search.
The right to refuse is an essential element of a voluntary consent to search. State v. Suazo, 133 N.J. 315, 319-20, 627 A.2d 1074 (1993).
Many persons, perhaps most, would view the request of a police officer to make a search as having the force of law. Unless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful.
[State v. Johnson, 68 N.J. 349, 354, 346 A.2d 66 (1975).]
The police need not necessarily advise the person of the right to refuse, as long as the State can prove the person was aware of this right. Ibid. Once a search has begun, there is no effective right to refuse. Therefore, consent given after the search has begun is neither voluntary nor meaningful. Cf. State v. Gredder, 319 N.J.Super. 420, 424, 725 A.2d 713 (App.Div.1999) ("capitulation to the requests of the police does not amount to a voluntary delivery" of a controlled dangerous substance for the purpose of acquiring immunity from prosecution for possession). Consent given after a search has begun does not validate the search from its inception. In State v. Weaver, 319 Or. 212, 874 P.2d 1322, 1327-28 (1994), Oregon's highest court held that consent to search given after the police had already searched and seized several items was not retroactive because there was no evidence defendant intended that his consent "related back" to the beginning of the search. See K. Winbush, Annotation, Effect of Retroactive Consent on Legality of Otherwise Unlawful Search and Seizure, 76 A.L.R. 5th 563 (2000). Indeed, Tonkery effectively conceded that he did not obtain permission to search. When Martelli was in Jamesburg on the day of Knowles's interview, she asked Tonkery and Hornberger why they did not ask for consent. They responded that they did not need to ask. No written consent to search was requested or even considered by the police.
Knowles testified the officers told him "that they had permission to search the vehicle." Carole Butewicz, the Jamesburg court administrator, testified she was present during Knowles's interview. She recalled that during a break when the cameras were still, Knowles asked Quinones whether the officers requested permission *580 to search the car. Quinones then asked a person whom Butewicz believed was the producer, who answered, "I believe they did, sir."
This did not create a genuine fact issue. Butewicz did not explain why she believed that person was the producer. Martelli, the producer, probably would not have addressed Quinones, her subordinate (or anyone else), as "sir." Chief Knowles, who, according to Butewicz, initially addressed the question to Quinones, said that this did not occur. Quinones also denied that this occurred. There was no corroboration of this statement, although others were present. Finally, if the officers had obtained consent to search, as Chief Knowles said they "indicated" to him, Knowles likely would have come forward and relayed this to Martelli when given another opportunity to respond shortly before the broadcast.
Campbell's alleged consent to search the bag containing the water bottle occurred after the search of the car had started, and was limited to the bag. See State v. Leslie, 338 N.J.Super. 269, 273-75, 768 A.2d 818 (App.Div.2001) (consent to search the passenger compartment of a car for identification did not authorize a search of the trunk); State v. Younger, 305 N.J.Super. 250, 256, 702 A.2d 477 (App.Div.1997) ("when police rely on a consent to search, the search that may be conducted thereto is limited by the scope, whether express or implied, of the consent").
A reasonable jury could not find that the officers obtained permission to search the car. Because the statement in the broadcast that there was no permission to search the car was factually true, it is unnecessary to consider whether defendants published it with actual malice.

B. Ogletree's Opinion that the Search of the Car was Improper
Plaintiffs contend that Ogletree's broadcast opinion that the search of the car appeared illegal, was based on incorrect and incomplete facts, making it both false and defamatory. In Lynch, 161 N.J. at 167, 735 A.2d 1129, the Court explained: "Statements of opinion, like unverifiable statements of fact, generally cannot be proved true or false. Opinion statements reflect a state of mind.... [They] do not trigger liability unless they imply false underlying objective facts." See also Turf Lawnmower Repair v. Bergen Record Corp., 139 N.J. 392, 418, 655 A.2d 417 (1995) (on discretion and judgment in the editorial process).
We agree with Ogletree, the judge and defendants that the search of the car was improper. Contrary to plaintiffs' assertion, Ogletree's opinion was not based on false or incomplete facts simply because the ABC defendants showed him the edited version of the tape: he maintained his position that the search was improper after he saw the full tapes and was apprised of allegedly inculpatory circumstances.
Ogletree admitted that the plaintiffs could have had a reasonable concern for their safety when confronted with Campbell's belligerent remarks upon leaving the carโthat he did not like cops and all cops were racistsโbut Ogletree did not state that the search was therefore valid. Campbell's remarks followed and resulted from the plaintiffs' improper removal of the passengers from the car and the frisking of the testers. Campbell's remarks did not justify the prior removal from the car or the subsequent search of the car.
The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures and provide for warrants, issued upon probable cause, describing the place to be searched and the thing to be seized. The Court established an *581 exception to this probable-cause requirement in Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968), allowing a police officer to "stop and frisk" a person whom the officer reasonably believes is armed and dangerous, when the officer does not have probable cause to make an arrest.
The Court expanded this exception to allow a protective search of the passenger compartment of an automobile, to locate weapons, if the officer reasonably believes "that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220 (1983) (footnote omitted). The Court explained that the officer's reasonable belief must be based on "specific and articulable facts ... taken together with the rational inferences from those facts." Ibid. (quoting Terry, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906). The New Jersey Supreme Court has held that "the Michigan v. Long rule is sound and compelling precedent and should be followed to protect New Jersey's police community." State v. Lund, 119 N.J. 35, 48, 573 A.2d 1376 (1990).
Here, if the inquiry were limited to the circumstances immediately preceding the search of the car, we might agree with plaintiffs that their belief they were in danger could possibly be considered reasonable. The specific facts supporting such a belief were Campbell's antagonistic remarks, made when leaving the car. Viewing the evidence favorably to plaintiffs, as required on this motion for summary judgment, Brill, 142 N.J. at 540, 666 A.2d 146, it appears, as Ogletree conceded, that these expressions of hostility might have caused reasonable police officers legitimate concern that their safety was endangered.
In addition, our Court in Lund mentioned "lying to the police" and "the absence of identification" as factors that, together with "`furtive' movements or gestures by a motorist," might "ripen into a reasonable suspicion that the person may be armed and dangerous." 119 N.J. at 48, 573 A.2d 1376. Here, the officers' concern for their safety might have been buttressed by Campbell's rejection of their demand to produce his identification, which the officers later discovered when they frisked him, and Armstrong's incorrect statement about Campbell's first name.
However, Campbell's remarks, Armstrong's incorrect statement of Campbell's name, and the plaintiffs' discovery of Campbell's identification, followed upon and were caused by the officers' improper removal of the passengers from the car and improper frisking of all three testers. Campbell's hostile remarks, when considered in the context of his spontaneous response to improper police action directed against him, are not nearly as threatening as they would be in circumstances in which the officers were less aggressive in pursuing a criminal investigation consequent upon a routine traffic stop.
If the initial stop is unjustified, then the subsequent search is invalid and any contraband obtained from it is inadmissible as "fruit of the poisonous tree." State v. Maryland, 167 N.J. 471, 489, 771 A.2d 1220 (2001). For example, in State v. Carty, 332 N.J.Super. 200, 208, 753 A.2d 149 (App.Div.), affirmed, 170 N.J. 632, 790 A.2d 903 (2002), we held that a pat-down of a passenger was invalid when its only justification was an improper consent to search the car.
The United States Supreme Court applied similar reasoning in Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). There, an officer *582 stopped defendant for driving with an expired license plate, ordered him out of the car, noticed a large bulge in his jacket, frisked him, and discovered a loaded revolver in his waistband. 434 U.S. at 107, 98 S.Ct. at 331, 54 L.Ed.2d at 334. The Court deferred considering the legality of the frisk, first addressing "the incremental intrusion resulting from the request to get out of the car." 434 U.S. at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 336.
The Court realized the absence of any reason to suspect that the driver presented a danger, but determined that the additional intrusion of the order to get out of the car, when the initial stop was justified, was "de minimus" or "a mere inconvenience," that "cannot prevail when balanced against legitimate concerns for the officer's safety." 434 U.S. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337 (footnote omitted). The Court then determined that the frisk was justified under Terry, when the officer saw the bulge in defendants' jacket. 434 U.S. at 111-12, 98 S.Ct. at 334, 54 L.Ed.2d at 337-38. Presumably, the Court would have invalidated the frisk if it had determined that the initial removal of the defendant from the car was improper.
Here, as the Law Division judge found, the initial stop was justified; the driver, Williamson, admitted that he probably did not use his signal when changing lanes. Nevertheless, the officers' improper "incremental intrusion," Mimms, 434 U.S. at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 336, rendered the ultimate search of the car constitutionally defective.
This incremental intrusion was the removal of the two passengers from the car and the frisking of all three testers. The removal of the driver from the car was permissible under Mimms. In State v. Smith, 134 N.J. 599, 616-17, 637 A.2d 158 (1994), our Court declined to extend Mimms to passengers and to enable police officers to routinely order passengers from their vehicle during a traffic stop. Our Court reasoned that the "intrusion on the passenger's privacy ... is greater than it is on the driver's privacy," because the passenger "has not engaged in the culpable conduct that resulted in the vehicle's stop." Id. at 615, 637 A.2d 158. Admitting that being asked to leave the vehicle was not "a major intrusion," the Court found that it "nevertheless amounts to an intrusion." Id. at 617, 637 A.2d 158.
For ordering occupants out of a vehicle during a routine stop for a traffic violation, in order to adequately protect police officers, the Court announced a standard of "heightened caution," more stringent than the "Mimms per se rule," but less stringent than the Terry rule. Smith, 134 N.J. at 618, 637 A.2d 158.
[T]he officer need not point to specific facts that the occupants are "armed and dangerous." Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car.

[Ibid.]
The Court elaborated that "the officer must be able to articulate specific reasons why the person's gestures or other circumstances caused the officer to expect more danger from this traffic stop than from other routine traffic stops." Id. at 619, 637 A.2d 158.
In Smith, the Court concluded that the circumstances were sufficient to warrant the order that the passengers leave the vehicle: the occupants had made suspicious movements in the car; it was 2:29 a.m.; and the Turnpike, where the stop *583 occurred, was deserted. Id. at 619-20, 637 A.2d 158.
Here, in contrast, to justify the removal of the passengers from the car, plaintiffs can point to nothing other than Campbell's failure to produce identification. Although Campbell displayed displeasure in his demeanor and attitude at being asked for identification, he was not threatening and there were no gestures or other circumstances which indicated that Campbell or the other testers might pose a danger. A passenger's lack of identification alone does not create a heightened awareness of danger in a reasonable police officer or warrant securing the scene. See State v. Lark, 319 N.J.Super. 618, 624, 726 A.2d 294 (App.Div.1999), aff'd. o.b., 163 N.J. 294, 748 A.2d 1103 (2000) (a driver's inability to produce his license, and lying to the officer about his identity did not constitute cause for the officer's concern about his safety). Cf. State v. Carty, 332 N.J.Super. at 204-07, 753 A.2d 149 (at a traffic stop for speeding, the driver's inability to produce credentials did not justify asking consent to search the car), affirmed, 170 N.J. 632, 790 A.2d 903 (2002). Our Supreme Court spelled this out clearly when affirming Judge Pressler's Carty decision:
We agree with the Appellate Division that consent searches following a lawful stop of a motor vehicle should not be deemed valid under [State v.] Johnson, [68 N.J. 349, 346 A.2d 66 (1975) ] unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity. In other words, we are expanding the Johnson two-part constitutional standard and holding that unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional. A suspicionless consent search shall be deemed unconstitutional whether it preceded or followed completion of the lawful traffic stop. The requirement of reasonable and articulable suspicion is derived from our State Constitution and serves to validate the continued detention associated with the search. It also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop. Indeed, our holding is consistent with both the State Police Standard Operating Procedures and the Consent Decree that was entered into by the State Police on December 29, 1999. Carty, supra, 332 N.J.Super. at 206, 753 A.2d 149.
[Id. at 647, 790 A.2d 903; emphasis added.]
We are controlled by the decision of our Supreme Court in Carty. The Court has ordered that its judgment in Carty "shall apply to all cases pending in the trial court and on direct appeal as of June 23, 2000." ___ N.J. ___, ___ A.2d ___, 2002 WL 788754*1. This complaint was filed in 1999 and Judge Garruto's decision was issued in August 2000. This case was thus pending in the trial court on June 23, 2000. See also, State v. Yanovsky, 340 N.J.Super. 1, 10-11, 773 A.2d 711 (App. Div.2001).
None of the officers testified in depositions that they removed the passengers from the car because of possible danger or a desire to secure the scene. To the contrary, Hornberger explained that he ordered Armstrong out of the car simply to ask him what Campbell's name was. In State v. Carty, 332 N.J.Super. at 209, 753 A.2d 149, this court considered other alternatives available to the trooper to protect his safety, less intrusive than a pat-down.
*584 The Court in Smith explained that, once an occupant is removed from the vehicle, in order to justify a "pat-down" the officer must state "specific, articulable facts" to show that a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 134 N.J. at 619, 637 A.2d 158 (quoting Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909). The Court in Mimms concurred that the standard set forth in Terry also applied to determine whether a frisk of the driver was proper, once the police ordered the driver out of the vehicle during a routine traffic stop. 434 U.S. at 111-12, 98 S.Ct. at 334, 54 L.Ed.2d at 337.
Here again, there were no facts which would cause a reasonably prudent officer to believe that his safety was in danger. Campbell's hostile comments cannot justify the frisks or pat-downs of the testers because the officers had already decided to frisk them, and had already removed Armstrong from the car and frisked him, before Campbell stepped from the car and made his remarks. Hornberger explained that a frisk or "quick patdown" was standard police procedure when a person was asked to leave a vehicle. Plaintiffs made no attempt to justify the pat-downs on the basis of specific facts to show that they believed they were in danger, as required by Smith and Mimms. Thus, the frisks of all three testers were improper.
In State v. Carty, 332 N.J.Super. at 208, 753 A.2d 149, we rejected a rationale similar to that of the officers here, that the pat-down of defendant-passenger was necessary because the trooper was concerned about turning his back on the occupants of the car while searching it. Defendant-passenger in Carty, like Campbell here, failed to produce identification. Id. at 203, 753 A.2d 149. Even with the additional factor, not present here, that the defendant in Carty "appeared to be nervous," ibid., this court held that the trooper did not have "any reasonable belief in a threat to his safety." Id. at 209, 753 A.2d 149. Here also, Campbell's failure to produce identification was not a basis for a reasonable belief that he was dangerous.
Our Supreme Court recently took a similar approach in State v. Dangerfield, 171 N.J. 446, 795 A.2d 250 (2002). There, defendant was improperly arrested for trespassing at a public housing complex. 171 N.J. at 457, 795 A.2d 250. The officer searched his person and found cocaine in his pocket. Id. 451, 795 A.2d 250. The Court held that the search was improper because there were no "articulable facts of potential danger" to justify a protective search for weapons, as required by Michigan v. Long, 463 U.S. at 1049, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220, and Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. 171 N.J. at 463-64, 795 A.2d 250.
In contrast, in State v. Roach, 172 N.J. 19, 796 A.2d 214 (2002), a search of defendant's person, after he was stopped for motor vehicle violations, was justified. The officers reasonably feared for their safety because defendant was intoxicated and nervous, failed to produce a driver's license, tried to leave the scene, reached for a prominent bulge at his waist, disobeyed one of the officer's orders, and had to be restrained. 172 N.J. at 28-29, 796 A.2d 214. Here, as in Dangerfield but unlike Roach, there was no reason for plaintiffs to believe that any of the testers were dangerous before they were removed from the car and the criminal investigation pursued.
Plaintiffs cite several circumstances which, they argue, gave them cause to believe that the testers posed a threat. However, none justified plaintiffs' removing the passengers from the car, then *585 frisking all three testers, and searching the car.
1. The car was cruising in a "high drug" area on another occasion. Sergeant Karkoska had previously seen the Mercedes in a high drug area and was suspicious simply because he was not familiar with the car. Unfamiliarity does not indicate danger and the car was not in a high drug area when stopped. No officer had run a license check on the Mercedes. Officers Karkoska and Morton, of the narcotics detail, both testified they had "noticed" the Mercedes earlier but never suspected its occupants of buying or selling drugs.
2. Plaintiffs assert that Williamson was driving erratically and nearly collided with the police car. However, Hornberger advised Williamson only that he had "failed to signal a lane change." Plaintiffs' failure to issue a summons, to mention this offense to Williamson at the time, or before the plaintiffs were deposed, undermine the importance of this allegation.
3. The insurance card had expired. An expired insurance card does not indicate that the occupants of a car are dangerous. Cf. State v. Carty, 332 N.J.Super. at 204, 753 A.2d 149 (a driver's failure to produce credentials does not justify a search of the vehicle), and State v. Lark, 319 N.J.Super. at 626, 726 A.2d 294 (a driver's failing to produce a license and lying about his identity does not justify a search of the vehicle). Hornberger admitted that he did not consider the expired insurance card "a major problem," and no tickets were issued for careless driving, N.J.S.A. 39:4-97; or illegal lane change without proper signal, N.J.S.A. 39:4-85, -88, or failure to have a proper identification insurance card, N.J.S.A. 39:3-29.
4. It was "late at night," approximately 9:30 p.m., when the incident occurred. This hour is not late compared to the 2:29 a.m. on the Turnpike considered late in Smith, 134 N.J. at 604, 637 A.2d 158.
5. Campbell told Officer Mennuti, when asked, that the testers had no destination. This must have occurred after Campbell was removed from the car, because it does not appear on the interior car tapes. It thus could not justify the removal of the testers from the car or their frisks, because the plaintiffs had already made the decision to remove the occupants from the car and frisk them before this exchange occurred. In addition, as Ogletree pointed out, driving without a destination does not suggest danger or criminal activity.
6. There were suspicious items, the cosmetic case and the bottle in the paper bag, in the car. When asked in his deposition why the water bottle was in a bag instead of in plain view, Campbell said: "I assume to give a suspicion that we were drinking." Williamson said that the water bottle was in a paper bag because it came from the store that way.
Contrary to plaintiffs' assertion, Martelli did not state that she or anyone else placed the cosmetic case in the car to arouse suspicion. In State v. Maryland, 167 N.J. at 488, 771 A.2d 1220, the Court declined to consider a paper bag, which the defendant put into the waist of his pants, as suspicious in the absence of any circumstances that might lead the officers to believe it contained contraband. Also here, regardless of the testers' motives for carrying the cosmetic case and paper bag in the car, plaintiffs point to no circumstances which could have led them to believe these parcels contained contraband. Motorists are not required to remove their personal possessions from the passenger compartments of their cars in order to avoid police suspicion.
Moreover, none of the plaintiffs mentioned any of these factors in explaining *586 why they believed that they were in danger. To the contrary, both Hornberger and Tonkery testified only that Campbell's actions and attitude led them to believe that they might be in danger.
The remaining circumstances on which plaintiffs rely pertain to Campbell's behavior. His refusal to comply with Hornberger's request that he show his hands does not appear on the tapes. His hostile comments, the discovery that he was lying about not having identification, and his response to one of the officers to look in the bag did not occur until after plaintiffs had ordered the occupants from the car, so these factors cannot justify that action. Contrary to plaintiffs' assertion, Campbell's actions did not appear to be evasive, or suggest that he was hiding something.
Finally, it is extremely dubious whether plaintiffs were justified in demanding identification from the passengers at the outset of the encounter. Plaintiffs cite State v. Wilcox, 180 N.J.Super. 452, 435 A.2d 569 (App.Div.), certif. denied, 88 N.J. 491, 443 A.2d 706 (1981), in support of their argument that the request for identification was proper, but there the police reasonably suspected defendant, a pedestrian, of the commission of other crimes. Id. at 454-57, 435 A.2d 569. In addition, this court in State v. Lark, 319 N.J.Super. at 629, 726 A.2d 294, declined to follow Wilcox to the extent that Wilcox "appears to recognize an exception to the probable cause requirement of the Fourth Amendment to search for identification."
Similarly, in State v. Alexander, 191 N.J.Super. 573, 575, 468 A.2d 713 (App. Div.1983), certif. denied, 96 N.J. 267, 475 A.2d 570 (1984), also cited by plaintiffs, the officers demanded that defendant, a pedestrian, produce identification after they saw him passing money to another person in a high drug area. We determined this constituted a slight but reasonable basis to suspect that defendant was engaged in a drug transaction and justified the request for identification. Id. at 577, 468 A.2d 713.
Here, unlike in Wilcox and Alexander, plaintiffs did not reasonably suspect the passengers of any crime when they demanded their identification. The passengers had done nothing more suspicious than riding in a car whose driver failed to signal a lane change.
We have recently addressed the propriety of a police officer's request for identification from a driver of a car. In State v. Sirianni, 347 N.J.Super. 382, 390, 790 A.2d 206 (App.Div.2002), we declined to adopt a per se rule that, before requesting identification from a person who is lawfully in a public place, police are constitutionally required to have a reasonable suspicion that this person has committed a crime. We emphasized that "mere inquiries" require no constitutional justification, id. at 387, 790 A.2d 206, and do not constitute detention "in the constitutional sense." Id. at 390, 790 A.2d 206.
We "continue to adhere to the general standard of reasonableness, measured against the totality of the circumstances including, in the mix, the seriousness of the criminal activity and the degree of police intrusion involved." Id. at 391, 790 A.2d 206. In Sirianni, the request for identification was justified because the police were staking out a residence while looking for a homicide suspect. Defendant drove to the home under surveillance at 2:20 a.m., stayed in his car, and appeared to observe the police. Id. at 385, 790 A.2d 206. We commented that "the officers would have been derelict in their duties if they had failed to investigate." Id. at 391, 790 A.2d 206. In addition, the police conduct in Sirianni was not overbearing or harassing; they did not restrain defendant, *587 issue orders, or accuse him of a crime.
In contrast, in the case before us, the officers were not investigating a crime, and there was no cause to suspect that the testers were armed, dangerous, or involved in any criminal activity. Although this alone does not render a request for identification unreasonable, under Sirianni, it is one of the circumstances for consideration.
Weighing the degree of police intrusion, the court in Sirianni noted that "nothing in the encounter conveyed to defendant that he was not free to refuse the officers' request." Id. at 392, 790 A.2d 206. In the case before us, Campbell was not free to refuse the request: when he failed to produce his identification, the officers ordered all of the occupants out of the car and frisked them. The degree of the police intrusion was substantial, escalating from a simple request for identification to a frisking of all three testers, and then a search of the car. Considering the totality of these circumstances, in accordance with the principles expressed in Sirianni, the initial request for the passengers' identification was unreasonable.
There are no New Jersey cases which address whether an officer may demand a passenger's identification after stopping a vehicle for a routine traffic violation and the out-of-state authority is split. In State v. Larson, 93 Wash.2d 638, 611 P.2d 771, 773-74 (1980); People v. Gonzalez, 324 Ill.App.3d 15, 257 Ill.Dec. 583, 753 N.E.2d 1209, 1214-15 (Ill.App.Ct.), appeal allowed, 197 Ill.2d 571, 261 Ill.Dec. 525, 763 N.E.2d 774 (2001); and Commonwealth v. Alvarez, 44 Mass.App.Ct. 531, 692 N.E.2d 106, 107-09 (1998), the courts held that asking a passenger in a car for identification, without any reasonable grounds to suspect criminal activity, violated either the Fourth Amendment or the state constitution. In Alvarez, 692 N.E.2d at 109, the court commented that "a random request for identification papers constitutes ... the sort of request uncomfortably associated with authoritarian societies and most commonly made of persons belonging to a racial or ethnic minority." Id. at 109.
On the other hand, in People v. Jackson, 13 P.3d 838, 840-43 (Colo.Ct.App.2000), aff'd in part, rev'd in part, 39 P.3d 1174 (Colo.2002); People v. O'Neal, 32 P.3d 533, 537-38 (Colo.Ct.App.2001); State v. Jones, 270 Kan. 526, 17 P.3d 359, 360 (2001); State v. Landry, 588 So.2d 345, 345-47 (La.1991); and Johnson v. State, 537 So.2d 117, 120 (Fla.Dist.Ct.App.1989), the courts held that officers may ask passengers in cars stopped for motor vehicle violations for identification, without any reasonable suspicion of criminal conduct.
We favor the view that the request for the passengers' identification here was improper. This view is the most consistent with our Supreme Court's decision in Carty and the prophylactic purpose of discouraging the police from turning a routine traffic stop into a "fishing expedition for criminal activity unrelated to the stop." State v. Carty, 170 N.J. at 632, 790 A.2d 903. There were no facts or circumstances to justify either removing the passengers from the car or frisking the three testers. The search of the car which followed was also improper, because it was consequent upon these prior, unjustified actions. We thus find it unnecessary to consider plaintiffs' argument that defendants broadcast Ogletree's opinion that the search of the car was illegal with actual malice.

C. Other Factors Omitted from the Broadcast
Plaintiffs contend that defendants' omission of a host of events from the broadcast resulted in a defamatory portrayal and constituted evident actual malice. *588 Plaintiffs are incorrect that one of these events, Campbell's failure to produce identification, was omitted from "DWB." Campbell's statement that he did not have identification was included in the broadcast.
Plaintiffs are also incorrect that the testers were "`driving and driving' around Jamesburg to `heighten suspicions' of the police." Campbell said that, on the night they were stopped, they had been circling in Jamesburg for a couple of minutes. The testers had been cruising for approximately twenty hours before they were stopped, but this occurred on four different nights, over six weeks, and in other towns as well.
Many of the omitted events were the circumstances that plaintiffs allege justified the search of the car careless driving, cruising in a high-crime area, the placement of the cosmetic case and water bottle in the back seat, an invalid insurance card, confusion about Campbell's name, having no stated destination, and Campbell's hostile comments. Because the search of the car was unreasonable notwithstanding these circumstances, their inclusion would not have significantly softened the impact, as portrayed in "DWB," and are not as important as plaintiffs contend.
The search was improper because plaintiffs had no reason to suspect that they were in danger when they removed the passengers from the car and frisked the three testers. This improper police action, not the omission of extraneous or minimally ameliorating circumstances, was the conduct which potentially lowered plaintiffs' reputation in the community. See Lynch, 161 N.J. at 166-68, 735 A.2d 1129.
Plaintiffs object to the omission during the search of Campbell's "consent" to look in the paper bag in the back seat which contained the water bottle, while showing Ogletree's disapproval of the officer's opening the bag. Again, Campbell's consent was not as significant as plaintiffs contend. Tonkery or Hornberger asked "what's in the bag, forties?" and Campbell responded, "[w]hy don't you find out?" This was a casual and flippant response to the inquiry, rather than a formal consent to search. In addition, it occurred after the search of the car had started. Very likely, the officers would have looked in the bag regardless of Campbell's response.
Plaintiffs contest the part of the broadcast in which Quinones related that ABC, through Martelli, returned to the intersection where the plaintiffs stopped the testers and observed that many cars changed lanes without signaling but none were stopped. Plaintiffs contend that Martelli counted cars at the wrong intersection. There is no evidence that Martelli returned to the wrong intersection.
Plaintiffs also protest the part of the broadcast in which Chief Knowles said, "it's called profiling." Plaintiffs are correct that when Chief Knowles said this in his interview he was referring to the practice of profiling in general, not this particular incident. On "DWB," Knowles's statement was inserted after Ogletree's comment that Tonkery suspected the testers of having "dope" because the testers were African-American men in a late-model car at night. Chief Knowles continued to explain profiling and stated that he did not agree with it. Knowles's comment, "it's called profiling," thus appears reasonably to refer to the general practice, not to this specific incident.
Even if Knowles's comment is interpreted to refer to the "DWB" incident, when viewed as a whole, in accordance with the Court's direction in Romaine v. Kallinger, 109 N.J. at 290, 537 A.2d 284, it accurately represented Knowles's position. It included Knowles's statements that there was *589 probable cause to stop the Mercedes because of the traffic violation, the search was "good," it was borderline whether plaintiffs should have asked permission to search, and no apology was necessary because the plaintiffs were "doing their job." The inclusion of these statements gave the impression that Knowles did not believe that plaintiffs were guilty of profiling, although the broadcast later included his admissions that the incident might be profiling and Tonkery was wrong to assume that there was "dope" in the cosmetic case. Knowles also testified that ABC was "fair minded" with him.
Several other factors cited by plaintiffs did not justify the search, soften its impact, or rehabilitate plaintiffs' reputation. Those factors are:
1. The testers were cruising for twenty hours on four nights before they were stopped. As Martelli pointed out, although twenty hours seems like a long time, most people are not stopped by the police "every 20 hours they are on the road."
2. The testers failed to follow the advice of an attorney to have their credentials and identification in order, to cooperate with the police, and to use signals. The testers' disregard of the attorney's advice did not justify the search or mitigate plaintiffs' improper conduct.
3. Phillips, the co-producer, was the cousin of Diane Armstrong, the owner of the Mercedes. Plaintiffs were not aware of this when they stopped and searched the car, and it has no relevance to plaintiffs' actions.
4. The testers' comments indicated that they wanted to harm plaintiffs. On May 18, six weeks earlier, when the testers were cruising but were not stopped, Armstrong said, "Son of a b.... We had them pussies." When the testers drove away after the videotaped incident, Williamson said, "pow" and Campbell said "fired." At his deposition, Campbell said that it was "an exciting experience." Anna Sims Phillips testified that the testers "wanted to go out that evening for a party and they were hoping to be finished soon." Contrary to plaintiffs' assertion, this discussion occurred when the producers and the testers met in a restaurant after the taped incident. The testers hoped to finish that meeting quickly, not finish the test quickly. Plaintiffs allege that Campbell commented to Williamson, while the plaintiffs were frisking Armstrong, that if he had produced identification, the police would not have removed Armstrong from the car. Campbell's comment was inaudible to us, but plaintiffs' claim is plausible because Williamson told Campbell that he should have produced his identification.
None of these comments proves that the testers desired to injure the plaintiffs. Plaintiffs are correct that they were fooled because the testers were driving around in the Mercedes for the purpose of inducing police officers to stop them. Nevertheless, plaintiffs had no cause to suspect that the testers were dangerous when plaintiffs removed them from the car and frisked them. The comments which plaintiffs cite do not justify or explain plaintiffs' conduct or reflect favorably upon plaintiffs' reputation.
We conclude that the judge correctly dismissed plaintiffs' defamation and false light claims. The broadcast's statements that the search of the car was improper and without consent were true. Moreover, they constituted expressions of legal opinion, and Ogletree's opinion that the search was invalid was plausible. Exculpatory factors, which plaintiffs claim were omitted from the broadcast, were not significant. Because of this, we find it unnecessary to reach the question of actual malice, i.e., *590 whether defendants broadcast false material with knowledge of its falsity or reckless disregard of its falsity.

IV
Plaintiffs next claim that the judge erred in rejecting their claim that defendants violated the Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -34 (the Act). Plaintiffs' claims go only to the portion of the tape which recorded Hornberger and Tonkery searching the car in the absence of the testers. During this search Tonkery said that there was "probably dope" in the locked cosmetic case. Plaintiffs' claims are premised on lack of consent to this conversational recording, a portion of which was disclosed in the broadcast.
Tonkery and Hornberger submitted unsigned, unsworn declarations that, while they were searching the Mercedes, they directed all of their statements solely to each other and believed that no one else could hear them. They explained that the testers were standing outside of the vehicle at that time and were not listening or speaking to Tonkery and Hornberger. Tonkery and Hornberger obviously did not consent to the taping.
"Oral communication" is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." N.J.S.A. 2A:156A-2(b).
The Act provides that
any person who: a. Purposely intercepts... any ... oral communication ... or b. Purposely discloses ... to any other person the contents of any ... oral communication... knowing or having reason to know that the information was obtained through the interception of a[n]... oral communication ... shall be guilty of a crime in the third degree.
[N.J.S.A. 2A:156A-3.]
The Act creates a civil cause of action for damages by any aggrieved person against the person who intercepted or disclosed their oral communication. N.J.S.A. 2A:156A-24.
In State v. Diaz, 308 N.J.Super. 504, 513-16, 706 A.2d 264 (App.Div.1998), we held that a videotape was admissible in a prosecution of a "nanny" for assaulting and endangering the welfare of a child, because the baby vicariously consented through her parents. We observed that the New Jersey Act was modeled after Title III of the Federal Omnibus Crime Control Act and Safe Streets Act, 18 U.S.C.A. งง 2510 to 2520. Our interpretation of N.J.S.A. 2A:156A-2 and -3 followed the federal courts' interpretation of 18 U.S.C.A. งง 2510 and 2511, which are "substantially similar." Id. at 509-10, 706 A.2d 264. The definition of "oral communication" is identical in N.J.S.A. 2A:156A-2(b) and 18 U.S.C.A. ง 2510(2).
Although neither party nor the judge raised this issue, the court in Diaz "follow[ed] the federal lead" and concluded that the New Jersey Act did not apply to the video portion of the videotape. Id. at 512, 706 A.2d 264. Here also, we conclude that the Act does not apply to the video portion of the film. Our inquiry is limited to the audio part of the recording.
Plaintiffs incorrectly claim that the Act does not require that they had a reasonable expectation of privacy for their conversation to be covered. They cite Diaz in support of this contention, but there we declined to consider the issue because we held that the audio portion of the recording was admissible based upon vicarious consent. Ibid. In State v. Tirelli, 208 N.J.Super. 628, 637, 506 A.2d 797 (App. Div.1986), we acknowledged that the definition *591 of "oral communication" in N.J.S.A. 2A:156A-2(b) encompassed an expectation of privacy.
In PBA Local No. 38 v. Woodbridge Police Dep't, 832 F.Supp. 808, 819 (D.N.J. 1993), concluding that telephone conversations were wire communications, not oral communications, under both the federal and New Jersey Acts, the court commented:
Courts interpreting [the definition of "oral communication" in the federal and New Jersey Acts] have opined that the "expectation of privacy" language in the statute was intended to parallel the language and standard of Katz [v. U.S., 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ], making the "reasonable expectation of privacy" highly relevant to claimed interceptions of oral conversations.
In Katz, the Court held that the Government's recording of the petitioner's end of conversations in a telephone booth "violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a `search and seizure' within the meaning of the Fourth Amendment." 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583. As defendants point out, most federal courts have used this standard in applying Title III of the Federal Omnibus Crime Control Act and Safe Streets Act. See, e.g., U.S. v. Peoples, 250 F.3d 630, 637 (8th Cir.2001) (recordings of conversations between a prisoner and his visitor at a correctional facility were admissible under the federal wiretap law because the individuals had no reasonable expectation of privacy in that conversation); Kee v. City of Rowlett, 247 F.3d 206, 211 (5th Cir.), cert. denied, ___ U.S. ___, 122 S.Ct. 210, 151 L.Ed.2d 149 (2001) (placement of an electronic surveillance microphone at an outdoor grave site during a funeral was not a violation of the federal Act because of no reasonable expectation of privacy); U.S. v. McKinnon, 985 F.2d 525, 527 (11th Cir.), cert. denied, 510 U.S. 843, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993) (a recording of defendant's conversation in the back seat of a police car did not violate the federal Act); U.S. v. Duncan, 598 F.2d 839, 849-53 (4th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979) (recording IRS auditors in an office that was assigned to them in the bank they were auditing violated the federal Act), and U.S. v. McIntyre, 582 F.2d 1221, 1223 (9th Cir.1978) (recording the assistant chief of police in his office violated the federal Act).
However, as plaintiffs point out, a few courts have distinguished between a reasonable expectation of privacy and a reasonable expectation that one's conversation will not be recorded. Boddie v. ABC, 731 F.2d 333, 339 (6th Cir.1984) (defendant-journalist filmed a participant in a scandal, without her consent); Walker v. Darby, 911 F.2d 1573, 1579 (11th Cir.1990) (a postoffice supervisor intercepted oral communications of a letter carrier); Angel v. Williams, 12 F.3d 786, 790 (8th Cir.1993) (plaintiffs-police officers accused of using excessive force on a prisoner alleged that an audio recording of the incident violated the federal Act).
The standard set forth in these latter three cases seems unduly restrictive. Few conversations occur in which the participants expect that their speech will be intercepted. (Intercept is defined as "the aural or other acquisition of the contents of any ... oral communication through the use of any electronic, mechanical or other device." N.J.S.A. 2A:156A-2(c).) Under the more restrictive standard, almost every oral communication, including shouting in a crowded public place, would be protected against interception, disclosure of *592 its contents, and use of its contents. N.J.S.A. 2A:156A-3.
The majority of courts which have considered this issue, as well as the most recent decisions, have adopted the reasonable-expectation-of-privacy standard. Though the Eighth and Eleventh circuits applied the expectation-of-non-interception test in Angel v. Williams and Walker v. Darby, more recent decisions in both circuits have used the expectation-of-privacy test, without acknowledging or discussing the expectation-of-non-interception standard or any difference between the two. See U.S. v. Peoples, 250 F.3d 630 (8th Cir.2001), and U.S. v. McKinnon, 985 F.2d 525, 527 (11th Cir.1993).
In State v. Tirelli, 208 N.J.Super. at 637, 506 A.2d 797, we held testimony that the witness expected the conversation to be private satisfied the statutory requirement of an expectation it not be intercepted. In State v. Diaz, 308 N.J.Super. at 512, 706 A.2d 264, we declined to address the issue, but framed it in terms of a reasonable expectation of privacy. We have adopted the majority expectation-of-privacy standard, which we follow here.
Whether a person has a reasonable expectation of privacy which is protected under the Fourth Amendment "posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986).
The New Jersey Supreme Court, interpreting our constitutional prohibition against unreasonable searches and seizures, N.J. Const. Art. 1, ง 7, has abandoned the first prong of this test and has held that the only requirement is "that an expectation of privacy be reasonable." State v. Hempele, 120 N.J. 182, 200, 576 A.2d 793 (1990). Our Court explained that it would be arbitrary to apply objective facts to one prong of the test rather than the other. Id. at 199, 576 A.2d 793.
However, as our Court predicted, id. at 200, 576 A.2d 793, the distinction makes no difference here. Plaintiffs declared that they directed their remarks to each other and believed that no one could hear them; this satisfies the requirement that they manifested a subjective expectation of privacy.
The first prong of the test, whether plaintiffs had a subjective expectation of privacy, is a question of fact, but the second prong of the test, whether their expectation was reasonable, is a question of law. U.S. v. Clark, 22 F.3d 799, 801 (8th Cir. 1994) (defendant had no legitimate expectation of privacy while sitting in the back seat of a police car); People v. Lesslie, 939 P.2d 443, 446 (Colo.Ct.App.1997) (defendant had a legitimate expectation of privacy in a bar restroom). See Angel v. Williams, 12 F.3d at 790 (whether it was objectively reasonable to expect that conversations would not be recorded was a matter of law). But see Boddie v. ABC, 731 F.2d at 338-39 (whether plaintiff's expectation that she was not being recorded and whether that expectation was reasonable were fact issues).
Courts which have considered the issue have generally determined that conversations which take place in enclosed, indoor rooms are protected. People v. Lesslie, 939 P.2d at 447-48 (defendant had a reasonable expectation of privacy in a bar restroom despite "the potential for a bystander to overhear"); United States v. Duncan, 598 F.2d at 849-53 (IRS agents auditing a bank had a reasonable expectation of privacy in their assigned office in the bank, despite the consent of the bank's *593 owner to recording the IRS's agents conversations, the hostility between the parties, and the fact that others could overhear the auditors from outside the office).
On the other hand, when the location of the conversation was a cemetery during a grave site service, the father and grandmother of the deceased children, whose mother was convicted of murdering them, failed to establish that they had a subjective expectation of privacy. Kee v. City of Rowlett, 247 F.3d at 215-18. The court commented that the open and publicly accessible place where the conversations occurred "may be a significant factor countenancing against finding a reasonable expectation of privacy." Id. at 217 n. 21.
Here, the location of the conversation between Hornberger and Tonkery was more akin to an open, accessible place than an enclosed, indoor room. The search of the car occurred on the shoulder of a busy public highway. Automobiles and other means of transportation are afforded a lower expectation of privacy than homes, offices and other structures. Chambers v. Maroney, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419, 426-27 (1970); State v. Lund, 119 N.J. at 38, 573 A.2d 1376. The four doors of the Mercedes were wide open while Hornberger and Tonkery were conducting their search, rendering the vehicle even more exposed. These officers were public servants performing their police function in public view. As recognized by the Supreme Court in Berkemer v. McCarty, 468 U.S. 420, 438, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317, 334 (1984), "[p]erhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist."
In Katz, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582, the Court said:
[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.
The court in Kee elaborated on this standard, listing six "nonexclusive factors to evaluate the subjective expectation of privacy in oral communications in publicly accessible places." 247 F.3d at 215. These six factors are:
(1) the volume of the communication or conversation; (2) the proximity or potential of other individuals to overhear the conversation; (3) the potential for communications to be reported; (4) the affirmative actions taken by the speakers to shield their privacy; (5) the need for technological enhancements to hear the communications; and (6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating.
[Id. at 213-14.]
These factors seem as relevant to the question whether the expectation of privacy was reasonable as they are to the question whether there was a subjective expectation of privacy. As the Court pointed out in State v. Hempele, 120 N.J. at 199, 576 A.2d 793, the same elements are applicable to both aspects of the standard. The most relevant factor is the location of the communication, including the circumstances in which it transpired.
Here, Tonkery's recorded comment, that it was "probably dope" in the locked case, was audible, and no technological enhancements were required. Tonkery and Hornberger took no action to shield their privacy. Although other individuals might have *594 been able to overhear the officers, if any were in the area, because the car was on a public street with its doors open, Hornberger and Tonkery explained that the testers were standing outside of the vehicle and were not listening to the officers.
In State v. Smith, 291 N.J.Super. 245, 261-62, 677 A.2d 250 (App.Div.1996), rev'd on other grounds, 155 N.J. 83, 713 A.2d 1033, cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L.Ed.2d 480 (1998), this court upheld a search of an apartment to which the defendant had obtained access by forcibly taking the keys from the tenant's sister. We commented:
To hold that defendant may assert a constitutionally protected privacy interest in the very apartment to which he has unlawfully and forcibly gained entry would constitute a raw injustice. No "general social norm" would countenance such an expectation on the part of an intruder, and we cannot conceive of how such a claim could possibly be construed as "reasonable."
[Id. at 261 (citations omitted).]
Here, unlike in Smith, plaintiffs' entry into the vehicle was not a crime. Nevertheless, because we concluded that plaintiffs failed to honor the testers' right to freedom from unreasonable searches, as in Smith, we are reluctant to recognize their own claims of privacy as reasonable. In addition, as the judge noted, plaintiffs' expectation of privacy is restricted because of their status as police officers. Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 189, 627 A.2d 602 (1993) ("As a police officer, plaintiff had a diminished expectation of privacy"); Hart v. City of Jersey City, 308 N.J.Super. 487, 493, 706 A.2d 256 (App.Div.1998) ("police officers, because they occupy positions of public trust and exercise special powers, have a diminished expectation of privacy."). See also State v. Flora, 68 Wash.App. 802, 845 P.2d 1355, 1357 (1992) (recording police officers' statements made while effectuating an arrest was not a violation of the Washington statute that prohibited interception of private conversations, because the officers did not "possess a personal privacy interest" in their statements).
Courts have held that police officers do not have a reasonable expectation of privacy when they are interacting with suspects. Angel v. Williams, 12 F.3d at 790 (officers were recorded while subduing an inmate in a jail), and State v. Flora, 845 P.2d at 1357 (officers were recorded while effectuating an arrest). Here also, plaintiffs, as police officers on duty, searching a vehicle on a public street, cannot expect the same level of privacy as a private citizen in a private place.
Plaintiffs rely on State v. Lane, 279 N.J.Super. 209, 217-20, 652 A.2d 724 (App. Div.), cert. denied, 141 N.J. 94, 660 A.2d 1193 (1995), in which we held that telephone conversations in defendant's house on his telephone line between his ex-wife and her mother, taped by defendant, were inadmissible because the taping violated the Act. We followed the mandate of N.J.S.A. 2A:156A-4(d), which specifically covers that situation. It provides: "The fact that such person [who intercepts the communication] is the subscriber to a particular telephone line does not constitute consent effective to authorize interception of communications among persons not including that person on that telephone." Id. at 218, 652 A.2d 724.
Plaintiffs argue that here also, defendants' ownership of the car and the recording equipment did not constitute consent to record conversations between others. Plaintiffs' reasoning is flawed. N.J.S.A. 2A:156A-4(d) stated that subscription to a telephone line was not consent to record a conversation of others on that line. This *595 statutory requirement is not relevant here because no telephone line was involved.
In addition, defendants do not contend that plaintiffs consented to the recording. Defendants assert that plaintiffs' conversation was not covered by the Act because it did not qualify as a protected "oral communication" under N.J.S.A. 2A:156A-2(b). Defendants are correct because plaintiffs did not have a reasonable expectation of privacy when they engaged in the recorded conversation.
Plaintiffs also rely on Commonwealth v. Hyde, 434 Mass. 594, 750 N.E.2d 963 (2001), where the court held that the defendant, a motorist, unlawfully recorded the remarks of police officers who stopped defendant for a traffic offense, in violation of the Massachusetts electronic surveillance statute. Id. at 964. The court noted that Mass. Gen. Laws ch. 272, ง 99B2 (1968) defined "oral communication" as speech, except for speech transmitted over public air waves. Id. at 965. Thus, unlike the federal Act and the statutes of most states, including New Jersey, the Massachusetts statute "did not require an expectation of privacy by the speaker in order to make the statute applicable." Ibid. The Massachusetts court refused to inject a requirement of an expectation of privacy into the statute. Such an expectation was contrary to the plain language of the statute.
That court further said that the Massachusetts statute prohibited the recording of conversations made with one-party consent, again unlike the federal Act and the statutes of most states, including New Jersey. Id. at 967. The court concluded that the Massachusetts Legislature "intended G.L. c. 272, ง 99, strictly to prohibit all secret recordings by members of the public, including recordings of police officers or other public officials interacting with members of the public, when made without their permission or knowledge." Ibid.
Plaintiffs are incorrect that Hyde is "directly on point with the issues herein." Although the facts are similar, the New Jersey Act, like the federal Act and those of most other states, is far less stringent than the Massachusetts Act applicable in Hyde. Unlike the Massachusetts Act, the New Jersey Act does not "strictly prohibit all secret recordings by members of the public." Ibid. The New Jersey Act allows members of the public to secretly record conversations when the speakers have no reasonable expectation of privacy, N.J.S.A. 2A:156A-2(b), or when one party to the conversation consents. N.J.S.A. 2A:156A-4(d). See State in the Interest of J.D.H., IV, 171 N.J. 475, 480, 795 A.2d 851 (2002).
We conclude the judge properly rejected plaintiffs' claim that defendants violated the Wiretapping and Electronic Surveillance Control Act when they recorded the conversation between Tonkery and Hornberger during their search inside the vehicle. Although the officers did not consent to the recording, they did not have a reasonable expectation of privacy while in the targeted vehicle under the circumstances.

V
Plaintiffs next contend that the judge erred in following Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir.1999), and dismissing their claim for fraud. The court in Food Lion held that a plaintiff could not avoid the First Amendment standards of a defamation claim by demanding "defamation-type damages under non-reputational tort claims." Id. at 522. Plaintiffs argue that Food Lion does not apply because (1) their fraud claim is based on pre-broadcast speech; (2) Food Lion was a Fourth Circuit decision which interpreted North Carolina law; and (3) New Jersey and other jurisdictions have *596 rejected Food Lion. The judge agreed with the reasoning of Food Lion. He rejected plaintiffs' assertion that their fraud claim was based on pre-broadcast speech, because "all of their damages flow from defendants' alleged libelous publication."
In Food Lion, two ABC reporters used false identifications, addresses, resumes and references to obtain employment at plaintiff's supermarkets and secretly videotaped improper food handling. 194 F.3d at 510-11. Portions of the videotapes were used in a national PrimeTime Live broadcast. Plaintiff did not sue for defamation, but for the manner in which ABC gathered its information, including trespass and breach of the reporters' duty of loyalty to plaintiff during their employment.
A jury found the reporters liable for these torts. Id. at 511. However, the court disallowed damages which resulted from the broadcast, such as lost profits, lost sales and diminished stock value. Id. at 522-24. The Fourth Circuit explained that a settled
First Amendment principle precludes the award of publication damages in this case.... Food Lion attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts. This is precluded by Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).
[194 F.3d at 522.]
The court stated that plaintiff admitted it did not sue for defamation because that claim required proof that the PrimeTime Live broadcast contained a false statement of fact made with actual malice, and plaintiff "was not prepared to offer proof meeting [this] standard under any claim that it might assert." Ibid. Plaintiff thus improperly sought "to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim." Ibid. The court disapproved this "end-run around First Amendment strictures." Ibid.
Plaintiffs here argue that Hustler Magazine and Food Lion do not apply. Plaintiffs reason that, unlike the claims in Hustler Magazine and Food Lion, their fraud claim is based on defendants' pre-broadcast misrepresentations. However, in Food Lion, the breach-of-loyalty and trespass claims also involved pre-broadcast conduct. 194 F.3d at 510-11. The question is whether the damages resulted from the broadcast and were the same damages available for defamation. Id. at 522.
When the damages are non-reputational and do not compensate for injury to plaintiff's state of mind, First Amendment proscriptions do not preclude recovery on a pre-publication tort, also involving a media-defendant's publication. Cohen v. Cowles Media Co., 501 U.S. 663, 671, 111 S.Ct. 2513, 2519, 115 L.Ed.2d 586, 598 (1991). There, the Court allowed economic damages resulting from plaintiff's loss of his job when defendants published his name, in breach of a promise of confidentiality, because his particular damages were distinct from defamation damages. Ibid.
In Veilleux v. NBC, 206 F.3d 92, 126-29 (1st Cir.2000), the court allowed damages limited to pecuniary loss resulting from a broadcast on a claim for pre-broadcast misrepresentation. There, defendants-broadcasters procured the cooperation of plaintiff, the owner of a trucking company, in a DateLine production by misrepresenting that the show would not include a group critical of the trucking industry. Id. at 102. Following Cohen, the court limited *597 plaintiff's damages to "his pecuniary loss (primarily the loss of trucking customers) flowing from the misrepresentations, not reputational or emotional distress damages." Id. at 128. The court in Veilleux failed to reconcile its allowance of damages for loss of business with the Fourth Circuit's Food Lion's disallowance of damages for lost sales and profits. 194 F.3d at 522-24.
Here, plaintiffs allege in their complaint that defendants' fraud:
injur[ed] ... the reputations of the plaintiffs, damaged their chances for promotion, made it difficult for them to obtain employment elsewhere, subjected them to ridicule and humiliation nationwide, and among their friends, family, loved ones, their neighbors and others in law enforcement.... As a result of the foregoing, plaintiffs suffered loss of sleep, anxiety attacks, fear of further invasions and defamations, powerlessness, chagrin, anger, frustration, embarrassment, humiliation, mental distress, general depression, and fear of being invaded by ABC.
These damages are almost entirely for injury to reputation and emotional distress. Plaintiffs allege damage to their chances for promotion and difficulty in obtaining other employment, but do not specify any promotion or other employment opportunity for which they were rejected.
Under Hustler, 485 U.S. at 56, 108 S.Ct. at 882, 99 L.Ed.2d at 52-53, and Food Lion, 194 F.3d at 522, plaintiffs are not entitled to these reputational and emotional distress damages, resulting from a publication, without showing that the publication contained a false statement of fact that was made with actual malice. As discussed in Part III of this opinion, plaintiffs have failed to establish that "DWB" contained a false statement of fact.
Plaintiffs also argue that Food Lion was based on North Carolina law. The Fourth Circuit's analysis on whether the defendants committed the underlying torts was based on state law. 194 F.3d at 512-22. However, the court interpreted federal constitutional law when it held that plaintiff could not obtain publication or "defamation-type" damages without satisfying First Amendment standards. Id. at 522-24.
Plaintiffs are also incorrect that New Jersey and other jurisdictions have rejected Food Lion. Plaintiffs rely on State v. Cantor, 221 N.J.Super. 219, 221, 534 A.2d 83 (App.Div.1987), certif. denied, 110 N.J. 291, 540 A.2d 1274 (1988), in which defendant, a newspaper reporter, was convicted of impersonating a public official in violation of N.J.S.A. 2C:28-8, thereby obtaining access to personal information from the mother of a homicide victim. This court emphasized that the defendant's status as a newsperson was not a defense: "The First Amendment has never been construed to provide immunity from either tortious or criminal conduct committed in the course of newsgathering; it provides no license to trespass, steal or surreptitiously intrude into another's home or office." Id. at 224, 534 A.2d 83. The court declined to "engraft upon N.J.S.A. 2C:28-8 the additional requirement that the defendant be motivated by actual malice." Id. at 225, 534 A.2d 83. The court explained that in a criminal trial, the defendant had more protection than a civil libel defendant because of the greater burden: proof beyond a reasonable doubt.
In the case before us, in contrast, there is no criminal prosecution. Defendants do not have the protection of a heavier burden of proof and they are not seeking to engraft the actual malice standard upon any criminal offense. Nor were they intruding into someone's private affairs; *598 they were "spying" on public officials in performance of their duties on a public street. Defendants do not claim immunity from their torts. The issue is whether plaintiffs are entitled to damages which resulted from defendants' broadcast. This court in State v. Cantor did not consider the question of tort damages.
In Dietemann v. Time, Inc., 449 F. 2d 245, 248 (9th Cir.1971), on which plaintiff relies, the court elevated a plaintiff's privacy over defendant-newsperson's First Amendment rights for the purposes of tort damages. Dietemann pre-dates Hustler and Food Lion; these later cases control.
The other cases on which plaintiffs rely involved a balancing of citizen-plaintiffs' right to privacy against media-defendants' right to freedom of the press. The courts stressed that media-defendants do not enjoy absolute immunity from liability for improper news-gathering. However, they did not consider the issue here, whether a plaintiff may recover reputational and emotional distress damages resulting from publication of material covertly obtained.
We hold that the PrimeTime Live video program DWB was not defamatory. The program portrayed with reasonable accuracy a routine traffic stop of young African-American males, resolved ultimately by a warning and without traffic violation charges for several admitted violations, which was in reality a pretext to launch a criminal investigation without articulable suspicion, probable cause, or legal consent.
Affirmed.

APPENDIX A
Barbara Westergaard, "A Guide to the State" 153-54 (2nd ed. 1988 Rutgers University Press).
Jamesburg Middlesex (C522) 4,114 [6,000 in 2001]
Jamesburg's first settlers, Scots fleeing religious persecution, arrived in the late 17th century, and its first mill dates to 1734, but the town's period of greatest prosperity began 100 years later when the railroad came through. Jamesburg eventually had two railroad lines and three depots and became the commercial and social center for the township and the surrounding agricultural area. This prosperity continued until after World War II.
Much of the town's growth can be attributed to James Buckelew, whose great-grandfather had arrived in the area around 1715. In 1832 Buckelew purchased Lakeview* (203 Buckelew Ave.; XXX-XXX-XXXX), originally a small 17th-century farmhouse overlooking the millpond (now Lake Manalapan), and enlarged it into a 23 room mansion with a colonnaded porch overlooking the lake. Buckelew farmed some 4,000 acres (and was the first in the area to use marl on his land), supplied 700 mules for the Delaware and Raritan Canal, established the Freehold and Jamesburg Agricultural Railroad, and helped establish the First National Bank. Because a black child was excluded from the existing school, Buckelew built another school, open to all, which, at the dedication ceremony, was referred to as the James B. School; James B. eventually became Jamesburg. When President-elect Lincoln was in Trenton on his way to his inauguration, he rode in Buckelew's coach from the Clinton St. station to the capitol. The house, also known as Buckelew's Mansion, is now open as a house museum, and Lincoln's coach is one of the items on display. Among those who helped restore the mansion were students from the New Jersey Training School for Boys. This school was built in 1867 as the New Jersey State Reform School on a large farm owned by Buckelew, *599 which may have been the site of a mid 18th century French and Indian War stockade. The museum has some period furnishings, items relating to local history, and a high-school memento room. In the front yard are some track from the Camden and Amboy Railroad and several anchoring stones. Special events, including a Christmas program, are scheduled several times a year. Open Wednesday Sunday, 12-4. Guided tours by appointment.
Although Jamesburg is Middlesex County's most densely populated community (over 4,000 people in less than one square mile), it abuts a county park that is almost as large as the borough. Thompson Park includes Lake Manalapan, where you can fish, boat, and skate; there are also athletic fields, hiking trails (including one accessible to the handicapped), picnic areas, tennis courts, playgrounds, and a small zoo. Part of the park has been designated a bird sanctuary. Several horse and dog shows, as well as two concerts, take place in the summer.
Just west of Jamesburg (take Forsgate Dr.) is Rossmoor, a retirement community built around a golf course. The land was once an early 20th-century estate and dairy farm the clubhouse was formerly a residence and each hole on the east course is modeled on a famous hole from a British course.