J-A25019-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DR. RAYMOND M. GORDON AND ST. MATTHEW'S BAPTIST CHURCH | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| CBS BROADCASTING, INC. DOING BUSINESS AS KYW TV-3 AND CBS 3, NATASHA BROWN, AND ELIZABETH HUR | |
| Appellees | No. 3132 EDA 2013 |

Appeal from the Judgment Entered on September 4, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 001974

BEFORE:  DONOHUE, J., WECHT, J., and PLATT, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 08, 2014**

In this defamation action, Dr. Raymond M. Gordon ("Pastor Gordon") and St. Matthew's Baptist Church ("St. Matthew's")[1] appeal the trial court's entry of summary judgment in favor of appellees CBS Broadcasting Inc.; Philadelphia, Pennsylvania TV station CBS 3; Natasha Brown; and Elizabeth Hur (collectively, "CBS").  Appellants claim that CBS defamed them in its broadcast concerning the arrest of Archie Bolger, a St. Matthew's congregant and former St. Matthew's "preacher," on suspicion of sexual assault of a minor.  They contend that the reporters' use of certain terminology and their

_____

[*]     Retired Senior Judge assigned to the Superior Court.

[1]     We refer to these parties collectively as "Appellants."

emphasis upon Bolger's affiliation with St. Matthew's led viewers to believe that Pastor Gordon was guilty of sexual misconduct and that he and/or St. Matthew's were complicit in the crime. The trial court entered summary judgment on behalf of CBS, concluding that no viewer reasonably could have drawn such conclusions. We affirm.

The trial court has provided the following factual history:

This case arises from a September 19, 2011 CBS evening news broadcast in which anchor Natasha Brown and [r]eporter Elizabeth Hur presented a story relating to the arrest of Archie Bolger on child molestation charges. This broadcast occurred after the New Jersey Prosecutor's Office issued a press release announcing Bolger's arrest and describing him as a "preacher at St. Matthew's Baptist Church in Williamstown[, New Jersey]."

The plaintiff in this case, along with St. Matthew's, is Pastor Raymond M. Gordon. Pastor Gordon is the congregation's senior spiritual [advisor] and [the] administrative leader of St. Matthew's; as evidenced by the broadcast's footage of a church sign and church van, his name appears where St. Matthew's name appears and his name is closely associated with the church.

It is not in dispute that Bolger is or was a preacher (he is at times referred to by church personnel as a "minister") at [St. Matthew's], which is one of the largest churches in the country. In the Baptist faith, a preacher is a person who volunteers to preach the gospel when called upon. "Preacher" and "Pastor" in this context, therefore, have technically different definitions. Therefore, while Bolger would give sermons at the church, he was not considered a spiritual or administrative leader there. There are generally at least 20 members of the church who are considered "preachers[."]

[CBS's] broadcast of September 19, 2011 beg[ins] with anchors Chris May and Natasha Brown introducing the story from the CBS studio; it then cuts to Elizabeth Hur, who is standing in the parking lot of St. Matthew's Church in New Jersey. Hur gives a live broadcast, which includes pre-recorded pieces of video.

- 2 -

Immediately before Brown turned the report over to Hur, she stated that "The Pastor works at St. Matthew's Church [. . .]"; this utterance occurred during a display of a map of part of South [New] Jersey on the television screen. Above the map were the words "PREACHER ARRESTED[."] During Hur's report, two pieces of pre-recorded footage were shown where Pastor Gordon's name was at least partially readable; one of these pieces of footage was of a sign at what appears to be St. Matthew's main entrance, the other was of a church van. Both the sign and the van include St. Matthew's name and an identification of Pastor Gordon as the pastor of the church. It is these three aspects of the broadcast upon which [Appellants] base their claims.

Trial Court Opinion ("T.C.O."), 9/4/2013, at 1-2.

Based upon these events, on January 17, 2012, Appellants filed suit against CBS in the Philadelphia Court of Common Pleas, asserting venue on the basis that defendant CBS 3 and its agents are located in Pennsylvania and that the broadcast complained of originated in Pennsylvania. In counts I and III, Appellants alleged "Defamation (actual malice standard)" on behalf of the two above-captioned claimants. Complaint at 14-15, 17-19. In their second and fourth counts, Appellants alleged "Defamation (negligence standard)." *Id.* at 15-17, 19-20. On February 21, 2012, CBS filed preliminary objections, which the trial court overruled on April 10, 2012. The trial court entered a case management order on April 24, 2012, and discovery commenced. On August 2, 2012, CBS filed a motion to dismiss the instant litigation due to *forum non conveniens*, and, in the alternative, to apply New Jersey law to Appellants' claims. The trial court denied CBS's motion without prejudice on September 21, 2012, but determined that New Jersey law did apply to this case.

On May 6, 2013, after extensive, evidently contentious discovery proceedings, CBS filed a motion for summary judgment. On September 4, 2013, after taking briefing and hearing argument, the trial court entered an opinion and order granting summary judgment to CBS and dismissing Appellants' complaint with prejudice. On October 3, 2013, Appellants timely filed the instant appeal. On April 14, 2014, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a)[2] incorporating by reference the reasoning set forth in its September 4, 2013 opinion.

Before this Court, Appellants raise the following issues, which are reordered to correspond to our discussion:

> 1. Whether the [t]rial [c]ourt erred in deciding that New Jersey's substantive defamation law should apply where Pennsylvania has a significant interest in creating uniform defamation standards for Pennsylvania broadcasters and publishers, and where New Jersey has no interest in making it more difficult for New Jersey citizens to obtain redress for reputational harm?
>
> 2. Whether the [t]rial [c]ourt erred in concluding as a matter of law that [CBS's] [b]roadcast, which identified the alleged perpetrator of a criminal sexual assault of a minor as St. Matthew's "Pastor," and which included images of Pastor Gordon's name, was neither false nor defamatory?
>
> 3. Whether the [t]rial [c]ourt erred in concluding that the [CBS b]roadcast, which identified the perpetrator of a criminal sexual assault of a minor as St. Matthew's "Pastor" and which included multiple images of St. Matthew's grounds, caused no reputational harm to St. Matthew's?

---

[2] The trial court did not direct Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

- 4 -

Brief for Appellants at 2.

Although we must take up the choice of law issue before turning to summary judgment, we begin with the standard of review that applies[3] to summary judgment orders:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. **Capek v. Devito**, 767 A.2d 1047, 1048, n.1 (Pa. 2001). As with all questions of law, our review is plenary. **Phillips v. A-Best Prods. Co.**, 665 A.2d 1167, 1170 (Pa. 1995).
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof . . . establishes the entitlement of the moving party to judgment as a matter of law." **Young v. PennDOT**, 744 A.2d 1276, 1277 (Pa. 2000). Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. **Penna. State Univ. v. County of Centre**, 615 A.2d 303, 304 (Pa. 1992).

---

[3] For the reasons set forth *infra*, we find that the trial court was correct ultimately to determine that New Jersey law should apply in this case. However, regardless of the substantive law that applies to a case, Pennsylvania courts apply Pennsylvania's procedural law. **See ADP., Inc., v. Morrow Motors Inc.**, 969 A.2d 1244, 1246 n.2 (Pa. Super. 2009).

*Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citations modified).

In order to determine whether the trial court erred in granting summary judgment, we first must decide whether Pennsylvania or New Jersey law governs Appellants' claims. In doing so, we must assess whether the relevant laws of the candidate states differ. If they do not, we need go no further. However, if they differ materially, we then must determine the governmental interests at issue and assess which state has the greater interest in the application of its law. *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. 2005) (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. 2000)).

The trial court noted at the outset of its choice-of-law analysis that the parties appeared not to dispute that New Jersey's and Pennsylvania's respective laws of defamation differ. T.C.O. at 3 n.2; *see* Brief for Appellants at 28-29. The court then turned to the second part of the choice-of-law inquiry concerning the respective governments' interests in the matter. The court began by reviewing the Restatement (Second) of Conflict of Laws § 150, upon which all parties rely. Section 150 ("Multistate Defamation") provides as follows:

> (1) The rights and liabilities that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2)    When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

(3)    When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state.

Restatement (Second) of Conflict of Laws § 150.    Restatement section 6 identifies the following principles as germane to the determination of which jurisdiction has the "most significant relationship to the occurrence":

(a)    the needs of the interstate and international systems,

(b)    the relevant policies of the forum,

(c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)    the protection of justified expectations,

(e)    the basic policies underlying the particular field of law,

(f)    certainty, predictability and uniformity of results, and

(g)    ease in the determination and application of the law to be applied.

*Id.* § 6.

The trial court's brief analysis focused upon the reputational interests of Appellants.  The trial court acknowledged Appellants' assertion that more than twice as many Pennsylvania households as New Jersey households saw the broadcast.  However, the trial court posited that "[d]efamation laws are

- 7 -

'undergirded by the state's interest in protecting the individual reputations of its citizens.'" T.C.O. at 4 (quoting **Fitzpatrick v. Milky Way Prods.**, 537 F. Supp. 165, 171 (E.D.Pa. 1982)). Emphasizing Appellants' concession that Appellants "are not as well-known in Pennsylvania as in New Jersey," and that a "vast majority" of St. Matthew's congregants live in New Jersey, the trial court concluded that Appellants' reputations would suffer the most in New Jersey. **Id.** Because "New Jersey defamation laws were enacted to protect New Jersey citizens . . . from damage to their reputations," New Jersey had a greater interest than Pennsylvania in the application of its laws to the instant case. Thus, the trial court determined that it should apply New Jersey's substantive law of defamation to the instant case.

Appellants note that, under Pennsylvania law, if Appellants are treated as private rather than public figures (the latter of whom are entitled to less protection in some jurisdictions), they need only establish CBS's negligence to recover. Brief for Appellants at 28 (citing **Amer. Future Sys., Inc., v. Better Bus. Bureau**, 923 A.2d 389, 400 (Pa. 2007)). However, under New Jersey law, whether Appellants are treated as private or public figures, they must establish "actual malice" to recover for a publication involving a matter "of public concern." **Id.** at 28-29; **see Durando v. Nutley Sun**, 37 A.3d 449, 457 (N.J. 2012).[4] Appellants contend that applying New Jersey law

---

[4] Appellants appear not to dispute that the Bolger story concerned a matter "of public concern." Although arguably they concede more than

*(Footnote Continued Next Page)*

- 8 -

would "only make it more difficult for that citizen to obtain redress for the damage to his reputation. In sum, New Jersey has no interest in either harming a New Jersey resident or protecting a Pennsylvania broadcaster, and thus [has] no interest in application of its substantive law here." *Id.* at 29.

In this regard, Appellants' argument is unconvincing. If New Jersey was inclined to yield to the gentler laws of other jurisdictions when reputational injury to its own residents was at issue, its law, presumably,

*(Footnote Continued)* —————————

necessary here, their failure to challenge that classification paired with cases at least suggesting that the case *sub judice* qualifies warrants our conclusion that this case, indeed, concerns a matter of public concern. ***See W.J.A. v. D.A.***, 43 A.3d 1148, 1157 (N.J. 2012) ("The actual-malice standard will apply when the alleged defamatory statement concerns a public figure . . . or involves a matter of public concern. . . . [T]o determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. . . . Content requires that we look at the nature and importance of the speech. . . . Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience."); ***Rocci v. Ecole Secondaire Macdonald-Cartier***, 755 A.2d 583 (N.J. 2000) (finding a matter of public concern where a teacher was accused of misconduct in front of students). Moreover, given Appellants' emphasis upon the breadth of their reach, it is not a leap to conclude that they qualify as public figures. Brief for Appellants at 3 (noting that St. Matthew's has a membership of over 11,000 members); Complaint at 3 (through various programs, "Pastor Gordon spreads the gospel by television, radio, and the internet to thousands of followers in South Jersey, Pennsylvania, Delaware, New York, and Maryland."); *id.* at 7 ("St. Matthew's is recognized nationally as a leader in the Baptist faith's non-charismatic, dispensational, pre-millennial movement."). Notably, despite the fact that CBS argues in its brief that Appellants are public figures, Appellants do not in their reply brief contest this premise. Consequently, we conclude that New Jersey's actual malice standard applies in the instant case.

would reflect that preference. That is to say, if New Jersey's government did not think that its law struck the appropriate balance between free speech and the protection of reputational interests, the easiest way to fix that would be to amend its own law. Instead, New Jersey affirmatively chose to raise the bar for claims of defamation arising in connection with public figures and matters of public concern to "protect[] the freedom of expression on public questions guaranteed by the First Amendment." *Hornberger v. Amer. Broadcasting Cos., Inc.*, 799 A.2d 566, 578 (N.J. Super. Ct. App. Div. 2002).[5]

Appellants also allude to the considerably larger audience in Pennsylvania, and argue that a state's interest lies not just in the protection of the putatively libeled party's reputation but also in the protection of its citizens from deception. *Id.* at 30 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984)). They argue further that Pennsylvania has a strong countervailing "interest in establishing uniform defamation standards for Pennsylvania's broadcasters." *Id.* (citing *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1093 (S.D.N.Y. 1984)).

---

[5] CBS notes that "New Jersey has strong and explicit policies encouraging free and open reporting on public figures and matters of public concern, and it places those policy interests above the ability of its residents to recover for alleged defamation." Brief for CBS at 46 (citing, *inter alia*, *Turf Lawnmower Repair, Inc., v. Bergen Record Corp.*, 655 A.2d 417, 426 (N.J. 1995)).

CBS counters by reference to Restatement section 150, which provides that the law that applies to single-publication defamation claims "usually" will be determined by the domicile of the alleged victim of the defamation. Brief of CBS at 43-44. By way of elaborating upon section 150's direction, CBS cites **Wilson v. Slatalla**, 970 F. Supp. 405 (E.D.Pa. 1997), for the proposition that "[t]he state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication." **Id.** at 414. In further support, CBS cites **Miller v. Gay**, 470 A.2d 1353 (Pa. Super. 1983), for the proposition that "inhabitants of a state (here Delaware) should not be accorded rights not given them by their home states, just because a visitor from a state offering higher protection decides to visit there." Brief of CBS at 46 (quoting **Miller**, 470 A.2d at 1356). We agree with the trial court's reasoning and CBS's argument. Consequently, we find that New Jersey's law of defamation properly was applied to this case.

That brings us to Appellants' second and third issues, which collectively challenge the trial court's determination as a matter of law that Appellants could not recover for defamation. Defamation is a statement that is "false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community." **Hornberger**, 799 A.2d at 578 (internal quotation marks omitted). Under New Jersey law, "[t]he threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning," a question that must be

decided by the court as a matter of law. *Romaine v. Kallinger*, 537 A.2d 284, 288 (N.J. 1988). "[T]he court must evaluate the language in question according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence. In assessing the language, the court must view the publication as a whole and consider particularly the context in which the statement appears." *Id.* (internal quotation marks omitted); *see Taj Mahal Travel, Inc., v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998) (reviewing New Jersey law: "A court must look to the 'fair and natural meaning which will be given it by reasonable persons of ordinary intelligence' and examine the publication as a whole and in context." (quoting *Romaine*, 537 A.2d at 288)). "Only if the language is ambiguous in the sense of being reasonably subject to either an innocent or a defamatory meaning, as determined by the court, does the jury decide as a question of fact whether the readers of the publication understood the language in its defamatory sense." *Hermann v. Newark Morning Ledger Co.*, 138 A.2d 61, 66 (N.J. Super. Ct. App. Div. 1958); *cf. Hornberger*, 799 A.2d at 578 ("[S]ummary judgment is favored in defamation cases to encourage comment on matters of public concern.").

Appellants do not contest that the circumstances underlying their defamation claim pertained to a matter of public concern. Thus, in order to survive summary judgment they not only must establish that an average viewer might reasonably infer from the broadcast that Pastor Gordon and/or

St. Matthew's were involved in Bolger's alleged criminal conduct, but also that CBS acted with actual malice in its reporting.

> Actual malice is defined similarly under federal and state law. *See Rocci v. Ecole Secondaire Macdonald–Cartier*, 755 A.2d 583 (N.J. 2000) (treating common-law actual malice and constitutional actual malice synonymously). In a speech-based tort case involving a media defendant, "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." *Dairy Stores, Inc., v. Sentinel Pub. Co., Inc.*, 516 A.2d 220, 233 (N.J. 1986); *accord New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). . . .
>
> The reckless-disregard-for-the-truth prong has been defined in a variety of different ways, but the core principle has remained constant: establishing reckless disregard requires a showing that the defendant made the statement with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). The test is subjective, not objective, and involves analyzing the thought processes of the particular defendant . . . . *See Costello v. Ocean Cnty. Observer*, 643 A.2d 1012 (N.J. 1994). . . . [T]o prove reckless disregard, there must be sufficient evidence that the named "defendant in fact entertained serious doubts as to the truth of the publication." *Id.*
>
> That an editor or reporter "should have known" or "should have doubted [the] accuracy" of an article before publishing it is insufficient to show reckless disregard for the truth. *Lawrence v. Bauer Publ'g & Printing Ltd.*, 446 A.2d 469, 477 (N.J. 1982). Thus, the actual-malice test will shield careless acts of publication that would be considered irresponsible by common journalistic standards. *Id*. . . .
>
> To act with reckless disregard of the truth, a defendant must "actually doubt" the veracity of the article. *Lawrence*, *supra*. Only "[i]f the recklessness approaches the level of publishing a knowing, calculated falsehood," based on the summary-judgment record, should the case go to the jury. *Maressa v. N.J. Monthly*, 445 A.2d 376, 389 (N.J. 1982).

*Durando*, 37 A.3d at 459 (citations modified).

- 13 -

In their complaint, Appellants alleged that CBS's report led "members of St. Matthew's congregation, local officials, and countless others throughout [CBS's] broadcast region [to believe] that Pastor Gordon had been arrested for or was somehow involved in Bolger's alleged criminal sexual assault." Complaint at 4. Similarly, Appellants allege that CBS "falsely, recklessly, and maliciously broadcast a report that led countless viewers to believe that Bolger's alleged criminal sexual assault involved St. Matthew's and, even more perniciously, that Pastor Gordon was the perpetrator of or was somehow involved in Bolger's alleged crimes." *Id.* at 13. "CBS['s] false and defamatory report of Bolger's arrest . . . caused viewers to conclude that Pastor Gordon is a criminal pedophile whose victims potentially extended to other members of St. Matthew's congregation, or that Pastor Gordon was somehow involved in Bolger's alleged crimes." *Id.*

Ultimately, whether these allegations, in tandem with the evidence obtained in discovery, sufficed to create a jury question hinges upon (1) whether, in the context of the entire broadcast, one or more "countless viewers" reasonably could believe that the broadcast implicated Pastor Gordon and St. Matthew's in the criminal conduct of which Bolger was accused, and, if so, (2) whether Appellants made out a *prima facie* case that CBS acted with the "actual malice" required by New Jersey law.

The trial court did not address actual malice directly. Instead, it concluded that the broadcast, viewed as a whole, was materially true and could not have defamatory meaning as a matter of law, a sufficient basis to

- 14 -

enter summary judgment even if CBS's actions were evaluated under the ordinary negligence standard that applies to defamation claims raised against private parties on matters not of public concern:

> [Appellants] argue that a reasonable viewer could watch the broadcast and conclude that Pastor Gordon was arrested for child molestation. [Appellants] base this argument on one utterance of the word "Pastor" by news anchor Natasha Brown and two instances where Pastor Gordon's name appears on the screen because his name is written on the church sign and the church van that are in the footage taken of St. Matthew's exterior. With respect to St. Matthew's, [Appellants] argue that it suffered the same damages as Pastor Gordon because its reputation hinges on the reputation of Pastor Gordon and because the broadcast suggested some connection between Bolger's crime and St. Matthew's.
>
> Viewing the broadcast as a whole, it is impossible to conclude that any person could walk away thinking that Pastor Gordon had been arrested. Archie Bolger's name is uttered repeatedly. It appears in writing on the screen repeatedly. Multiple pictures of Bolger are shown. A picture of Bolger's home is shown. . . .
>
> Pastor Gordon's name appears twice in writing in the broadcast; neither of these appearances are a result of CBS typing Gordon's name onto a screenshot like it did with Bolger's name numerous times. . . . A reasonable viewer, therefore, would not conclude that Pastor Gordon was a child molester, but that Pastor Gordon's name happened to appear wherever St. Matthew's was advertised because he decided to put his name in several places on church property that are meant for the public to see.
>
> On the *sole* occasion [when] Brown utters the word "Pastor[,"] the utterance is accompanied by a screen shot that includes the phrase "PREACHER ARRESTED" superimposed on a map of part of South Jersey. Neither Brown nor anyone else during the broadcast say[s] "Pastor Gordon" or "Dr. Gordon" or "Raymond Gordon" or otherwise use[s] Pastor Gordon's name.
>
> * * * *
>
> Taken as a whole, the broadcast is not a substantial and material factual deviation from the truth, as it relates to both the Pastor

and to the church. No phrase in the broadcast was untrue as it related to St. Matthew's. While being mentioned in a report about an accused child molester is perhaps not exactly the kind of publicity a church craves, mere mention that Bolger was a preacher at the church does not amount to defamation; if anything, as [CBS] notes, CBS's mention that Bolger's victim was *not* a member of the congregation served to further distance the church from the allegations and reinforce the idea that St. Matthew's was only mentioned in the context of providing biographical facts about Bolger. As to Pastor Gordon, as discussed above, when the broadcast is viewed in context, it is both materially true and does not suggest that Pastor Gordon had any involvement in Bolger's criminal activity at all.

T.C.O. at 5-7 (emphasis in original).

Appellants contend that the trial court overlooked "critical points—particularly with respect to the majority of the [b]roadcast's viewers who had never seen or heard of Pastor Gordon." Brief for Appellants at 19. Appellants also note correctly that Bolger's name neither was stated nor appeared on the screen until over one minute into the broadcast.[6] Appellants argue that the repeated references to Bolger as "pastor" or "preacher" created a misapprehension that was not materially offset by the eventual broadcast of a photo of Bolger or video taken from outside Bolger's

---

[6] In a gesture typical of television news broadcasts, but arguably inconsistent with journalistic norms (*i.e.*, the "inverted pyramid," which refers to a method of reporting that foregrounds the most important information at the "top" of a news story), **neither** Pastor Gordon's nor Bolger's name appeared until the second half of the report. Pastor Gordon's name appeared on the church sign one minute and three seconds into the broadcast, again on the side of the church van at 1:09 of the broadcast, and Bolger's photo appeared at 1:16 closely followed by the reporter's identification of Bolger by name at 1:18.

private residence: "[T]he vast multitude of viewers . . . had never heard of Pastor Gordon, and thus neither knew what his home looked like or where he lived." *Id.*

Appellants also contest the trial court's finding as a matter of law that "when the broadcast is viewed in context, it is both materially true and does not suggest that Pastor Gordon had any involvement in Bolger's criminal activity at all." T.C.O. at 6. "[I]n describing the person arrested for criminal sexual assault as '[t]he Pastor [who] works at St. Matthew's Baptist Church,'" Appellants contend, "Natasha Brown used words that were unquestionably false and defamatory." Brief for Appellants at 21.[7] Appellants maintain that, for the foregoing reasons, the trial court overstepped its bounds in determining that no reasonable viewer could glean from this report that Pastor Gordon was, in fact, the individual arrested for sexually assaulting a child.

Regarding St. Matthew's, Appellants emphasize that defamation of an entity's principals may "reflect discredit upon the method by which the corporation conducts its business." Brief for Appellants at 26 (quoting Restatement (Second) of Torts § 561). Begging the question at hand, they

---

[7] To the extent the formal definition of "pastor" is employed as Appellants maintain, Brown on this one occasion did misuse the term in reference to Bolger. As well, referring to Bolger as "working" at St. Matthew's is inaccurate, or at least misleading, because Bolger's evidently occasional service as a "preacher" never rose to the level of employment.

argue that "the [b]roadcast identified St. Matthew's one and only Pastor as an alleged criminal pedophile," such that "viewers quite reasonably concluded that . . . St. Matthew's had some role in the alleged crime." *Id.* at 27. They submit that Pastor Gordon's "name is synonymous with St. Matthew's, and any aspersion on Pastor Gordon's character . . . plainly casts aspersion[s] on how St. Matthew's conducts its Church and its ministry." *Id.* at 27-28.

As the trial court observed, Appellants' arguments ultimately depend upon a fine-grained parsing of excerpts of the broadcast to rebut the trial court's finding of material truth taken from the context of the entire broadcast. This Court would be hard-pressed to dispute that the broadcast was sloppy, not least in its interchangeable usage of "pastor" and "preacher." But the trial court was not bound to evaluate the content or tone of CBS's report based upon an inattentive viewer, and Appellants provide no argument to that effect. Rather, the trial court was bound to ask whether an average person of ordinary intelligence reasonably could have believed, after watching the entire report, that Pastor Gordon was the suspect charged or that Pastor Gordon or St. Matthew's were implicated in the suspected criminal activity, rather than peripherally connected to the suspected criminal.

We have carefully reviewed the CBS broadcast in its entirety. We also have reviewed the legal authorities cited by Appellants in support of their appeal, and find that none of them are controlling—trivially because they

were not decided by New Jersey courts, and more broadly because none of them present apposite fact patterns. *See* Brief for Appellants at 15-18. We acknowledge that the report featured an arguably disproportionate focus upon St. Matthew's, insofar as the church occupied the screen and was repeatedly referred to by name by the reporters more or less throughout the first minute of the report, during which no one uttered Pastor Gordon's or Bolger's name and neither Pastor Gordon's nor Bolger's name or likeness appeared on the screen in any way. We also must acknowledge, however, that Bolger's undisputed affiliation with St. Matthew's contributed to the story's newsworthiness, and it was not unreasonable for CBS to highlight that connection. When St. Matthew's, presumably through the agency of Pastor Gordon, elevated Bolger to the position of preacher, it exposed St. Matthew's, and thus Pastor Gordon, to negative publicity in the event that Bolger was alleged to have acted criminally toward a minor.

Stripped to its essential content, CBS's broadcast identified one and only one person as a suspected sexual assailant, and that person was not Pastor Gordon. The broadcast accurately identified Bolger as a member of St. Matthew's and accurately stated that he had served St. Matthew's as a preacher. And that one reporter referred once to Bolger as "Pastor" amid numerous references throughout the broadcast to Bolger as "preacher," would have been outweighed for an average viewer by the references to Pastor Gordon in St. Matthew's signage, upon which Appellants base their defamation claim. In arguing that a reasonable viewer of ordinary

intelligence could conclude that Pastor Gordon was implicated in the criminal activity due to the allegedly prominent appearance of his identification on St. Matthew's sign and van that were pictured in the report, Appellants essentially forfeit their argument that an average viewer reasonably could have concluded that Bolger, in fact, was the "pastor" at St. Matthew's.[8]

The incidental inaccuracies in CBS's broadcast, *see infra* n.7, were cured for an average viewer who viewed the report in its entirety, at the conclusion of which no viewer of ordinary intelligence reasonably could have concluded that Pastor Gordon had been arrested in connection with, or was complicit in, Bolger's alleged criminal activity. If such a viewer had concluded that Pastor Gordon or St. Matthew's was complicit, that conclusion would have been a product of conjecture and inference arising not from CBS's reporting but from the fact that the inevitably brief report[9] concerning the breaking story did not conclusively state otherwise. Moreover,

_____

[8] In putting so much stock in the effect upon a reasonable viewer of referring once to Bolger as "Pastor," Appellants appear to impute to the majority of viewers who were not Baptists particular knowledge of Baptist tradition. However, if the average viewer does not appreciate the distinction, and tends to conflate "preacher" and "pastor," then it does not matter whether the reporters used one title or the other. If that is the case, Appellants' argument leads to a circumstance where a reporter cannot report, even if truthfully, that Bolger had served St. Matthew's as a preacher; only by omitting that fact entirely could the reporter ensure that an average viewer would not mistakenly conclude that Bolger led the St. Matthew's congregation. That is a patently untenable result.

[9] There is seldom any other kind on half-hour broadcast evening news programs.

notwithstanding the prominent placement of St. Matthew's in the broadcast, and the reporters' perhaps unnecessarily emphatic references to Bolger's affiliation with that church, the reason for foregrounding St. Matthew's was clear in context: Bolger once had occupied a prominent position in a very prominent congregation, or at least a position in some sense more conspicuous than the vast majority of St. Matthew's thousands of congregants. We sympathize with the negative publicity that descended upon Pastor Gordon and his church, but people and institutions frequently are besmirched by their affiliations in ways that are not actionable, and this appears to be such a case. We are constrained to conclude that the trial court did not err in granting summary judgment to CBS in this matter.

Our conclusion in this regard does not require us to entertain the question whether Appellants set forth a *prima facie* claim adequate to satisfy New Jersey's requirement that a reporter act with actual malice to enable recovery for defamation by a public figure in the context of a matter of public concern, because Appellants have failed to establish even ordinary negligence. Had they established a material falsehood, however, we would conclude that the trial court did not err in finding that Appellants failed to proffer sufficient evidence based upon which a jury might conclude that CBS "actually doubt[ed] the veracity of the article," or that CBS's recklessness "approache[d] the level of publishing a knowing, calculated falsehood." **Durando**, 37 A.3d at 459 (internal quotation marks omitted).

Judgment affirmed.

Judge Donohue joins the memorandum.

Judge Platt concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2014